447 F.2d 50
 William C. SHIFLETT, Appellant,
v.
COMMONWEALTH OF VIRGINIA, and C. C. Peyton, Superintendent of the Virginia State Penitentiary, Appellees.
John Henry LOVE, Appellant,
v.
COMMONWEALTH OF VIRGINIA, Appellee.
Orrillion D. JAMES, Appellant,
v.
C. C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.
 No. 12355.
 No. 13392.
 No. 13522.
 United States Court of Appeals, Fourth Circuit.
 Resubmitted En Banc November 19, 1970.
 Decided June 24, 1971.
 
 No. 12355:
 Frank C. Maloney, III, Richmond, Va. (Court-assigned counsel) [Joseph L. Lewis, and Hirschler & Fleischer, Richmond Va., on the brief], for appellant, Shiflett.
 Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Andrew P. Miller, Atty. Gen. of Virginia, on the brief), for appellees.
 No. 13392:
 Benjamin Lerner, Philadelphia, Pa. (Court-assigned counsel), for appellant Love.
 W. Luke Witt, Asst. Atty. Gen. of Virginia (Andrew P. Miller, Atty. Gen. of Virginia, on the brief), for appellee.
 No. 13522:
 Louis M. Natali, Jr., Philadelphia, Pa. (Court-assigned counsel), for appellant, James.
 Vann H. Lefcoe, Asst. Atty. Gen. of Virginia (Andrew P. Miller, Atty. Gen. of Virginia, on the brief), for appellee.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 The question is whether our decision in Nelson v. Peyton, 4 Cir., 415 F.2d 1154 should be applied retroactively. A divided panel earlier held Nelson retroactive, affording the right to habeas corpus relief to any indigent prisoner who had not been fully advised by his attorney or the court of his right to appeal as an indigent and of the manner and time in which an appeal could be taken. 433 F.2d 124. On reconsideration en banc of the relevant criteria for determining the application of new constitutional standards, we conclude, to the contrary, that Nelson's application should be prospective only.
 
 
 2
 The facts will be discussed only as necessary to supplement the original opinion.
 
 
 3
 Shiflett was convicted in 1963 of second degree murder. He was represented by attorneys retained by his parents. At a state habeas corpus hearing he testified that the lawyers told him that he could appeal if he wished, but "that it would cost a large sum of money." He conceded that he never told either lawyer that he wished to appeal. In contrast, attorney Timberlake[1] testified that money was never discussed with Shiflett. He said that he discussed funds only with the parents, since it was to them that he looked for compensation. He understood that they would pay for an appeal if one were taken. His advice was against an appeal, since he believed one would be fruitless.[2] Because decision was based on the application of standards before Nelson was decided, the conflict in testimony was not resolved by the state judge.
 
 
 4
 Love was convicted in 1965 of second degree murder. He was represented by court-appointed counsel who was also appointed to represent him in another trial on another charge which took place a week later. Love testified that he did not know that he could appeal as a pauper, relying, he said, on statements of other jail inmates that "you had to have so much money before you could appeal." These statements were allegedly made to him in the interim between the two trials at a time when he was seeing his lawyer, but he claimed he did not mention them to the lawyer or inquire about their accuracy. He stated that the lawyer at no time discussed the question of an appeal with him. However, the state court found, to the contrary, that the matter was discussed on two occasions between the trials, and that the lawyer had told Love that he believed an appeal would be futile, as no error had been committed in the trial. At no time did Love indicate that he would like to take an appeal despite his lawyer's opinion.
 
 
 5
 James was convicted of murder in 1958. He was represented by a lawyer retained by his mother. James testified that he knew nothing of appeals and did not learn of them until seven years later.[3] His lawyer, he said, never mentioned the subject of an appeal. The lawyer testified that he had been paid $100 by James' mother, and he knew this to be the extent of her resources. No transcript of the trial proceedings was made, although the lawyer made notes during the trial which could have served as the basis for a narrative statement had an appeal been taken. Immediately after the trial he reviewed the notes to determine if they showed any basis for an appeal. He concluded that no basis could be found.[4] He had no indication that James desired to appeal. "At that time, I would have happily made an appeal even though it wasn't feasible, but because he wanted one; but that wasn't asked me, as I recall. It wasn't asked me at all." Because he knew James had no money, and his mother had exhausted hers, he did not discuss the cost of an appeal with either. There is no indication that the state of their finances played any part in his conclusion that an appeal should not be taken.[5] Apart from the question of expense, he may have discussed his opinion that there was no ground for an appeal with James or his mother, or both, but he could not remember, and his notes on the case had since been destroyed by fire. James, himself, however, testified that there was one interview with his lawyer after the trial. The most likely subject of conversation at such a time would be the appropriateness of some effort to obtain a new trial by motion or appeal.
 
 
 6
 As in Shiflett's case, the testimonial conflicts were not resolved at the state hearing.
 
 
 7
 In none of the cases were the defendants advised of their right to appeal as indigents, nor were they advised of the required procedures for instituting an appeal under Virginia law.
 
 
 8
 The post-trial events in all three cases were consistent with the almost universal practice of lawyers at the time. A lawyer retained or appointed to represent a defendant ordinarily was prepared to advise his client to appeal, and to assist him on appeal, if he believed there was a reasonable prospect of success. In the absence of such a belief, he considered his duty done at the conclusion of a trial unless he was informed by his client, or otherwise had reason to believe, that he wished to appeal nonetheless. Our former cases recognized and upheld this practice. Repeatedly we declined to attach constitutional significance to an attorney's failure to take steps leading to appellate review where the defendant had made no contemporaneous expression of dissatisfaction with the trial's result and had failed to indicate any affirmative desire for an appeal. See Allred v. Peyton, 4 Cir., 385 F.2d 360.
 
 
 9
 In requiring as part of any competent trial representation that a lawyer inform his client fully of his appeal rights, Nelson is in accord with the trend of recent decisions recognizing that although matters of strategy and tactics are principally for the lawyer to determine, the decision to exercise or forego a guaranteed right is for the defendant alone to make. Although he will, it is hoped, be guided by counsel's advice, he must be unfettered by improper hindrances, North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, and he must be provided full information on which to make an informed choice, Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, although he need have no good or rational reason for his decision. To assure that the decision to take or forego an appeal would depend only on the defendant's own informed choice, we required in Nelson that he be given complete information, by his lawyer or by the court, about his right to appeal and the conditions he must meet in order to exercise it.
 
 
 10
 That the rationale on which Nelson proceeded was based largely on the Sixth Amendment right to counsel is not determinative, or even of significant assistance, in considering whether the rule it announced should be given retroactive effect. It is settled that the retroactivity of a new rule does not depend on the particular section of the constitution on which it is based.[6] What is important is the purpose to be served in requiring the presence of counsel at a particular point. Numerous cases expanding the right to counsel have been limited to prospective application, particularly in situations where a lawyer was required to serve some function other than the performance of his traditional role of advocate.[7]
 
 
 11
 The advocate's function is the concern of such cases as Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799 (trial), Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (sentencing) and Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (presenting appeals). They recognize that an untutored defendant is helpless, without the assistance of a professional advocate, to meet legal arguments he does not understand and to present evidence he knows not how to adduce. The denial of a professionally trained advocate "must almost invariably deny a fair trial * * *" Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199.
 
 
 12
 The lawyer's function at the post-trial pre-appeal stage is more limited. His role here is as adviser. His function is to ensure that the defendant's decision whether to exercise his right to appeal will be an informed one. In this he performs a task quite similar to that the police are required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 to perform before questioning a suspect.
 
 
 13
 Analysis of the purpose Nelson sought to achieve reveals the rule as a largely, if not exclusively, prophylactic one. As in Miranda, it intends to guarantee that no defendant will waive his right without full awareness of its existence and extent, by imposing an absolute requirement on court or counsel to furnish the information. Because such decisions apply to a range of cases far broader than those in which the evil aimed at has in fact occurred, it is rare that they are given retroactive effect. Nelson is such a case. We do not think it accurate to assert that failure to give the specific advice it requires "substantially impairs [the trial's] truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials * * *" Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388. "We think we should not lightly assume that there was trial error and that any assumption should be to the contrary." James v. Copinger, 4 Cir., 441 F.2d 23, 25 (on rehearing).
 
 
 14
 Incident to analysis of the purpose of a new constitutional decision and of some importance in determining whether it should be given retroactive effect, is the question whether there are remedies under earlier decisions for those persons most likely to have been harmed by the practices newly condemned.[8] We think remedies are available in this context. The class which would be benefited by retroactive application of the Nelson rule consists largely of those defendants least likely to have been harmed by their lawyers' failure to advise them fully of their appellate rights. Those defendants whose lawyers believed that an appeal stood a reasonable chance of success were generally assured of an appeal, for it was rare that a lawyer would not take steps to protect his client's appellate rights in such a case. Those defendants, whether or not advised of their rights, who indicated either to the court or to their lawyers that they wanted to appeal, and for whom no appeal was taken, would be entitled to relief without the necessity of applying the Nelson rule to their cases. Weatherman v. Peyton, 4 Cir., 433 F.2d 124;[9] Williams v. Coiner, 4 Cir., 392 F. 2d 210. Retroactive application would afford relief in precisely those cases in which the defense lawyer saw no realistic possibility of a successful appeal and had received no indication of his client's desire to pursue an appeal. In such cases, all appearances indicate that all concerned believed justice to have been fully served at the conclusion of the trial.
 
 
 15
 The trial lawyers in each of these cases thought an appeal would be futile. There was no substance in the point Shiflett's lawyer considered presenting on appeal, as will be demonstrated later in this opinion. The lawyers for Love and James did not even have a point to consider. As Shiflett's lawyer observed, also, even a successful appeal would gain nothing if Shiflett was subject to retrial and inevitable reconviction. The state's case against James was so overwhelming that an appeal looking only to a new trial would have been little availing.
 
 
 16
 Under the standards prevailing at the time, a lawyer in those circumstances had a right to assume he had done his full duty. It was not thought too much to ask even of an indigent defendant, aware of the existence of a system of appellate review if not of its details, that he indicate some desire to avail himself of that system before his lawyer or the court would be charged with a duty to proceed further. Our earlier cases requiring some inquiry on his part before his lawyer was under further duty to him were premised upon an assumption of minimal awareness of the existence of a higher court. A defendant's complete ignorance of the existence of some system of review was thought so unlikely that the statement of a general rule need not provide expressly for that rare possibility. There may have been exceptional cases calling for exceptional relief, but the general experience underlying such assumptions seemed to justify the rule in effect until Nelson extended the prophylactic protections of F.R.Cr.P. 32 (a) (2) to prisoners on trial in state courts.
 
 
 17
 Here too, Nelson parallels Miranda. Just as Miranda imposed the four-fold warning requirement without respect to the accused's actual knowledge of his Fifth and Sixth Amendment rights, Nelson noted that no finding had been made that the petitioner was unaware of a right to appeal. Indeed, he had not been asked at the hearing about his knowledge. The most that could be said was that he may have been unaware of the details of perfecting an appeal.[10] The decision rested in no respect on the state of his knowledge, but on the fact that he had not been advised of his rights at or after trial.[11] Such a rule is preventive rather than remedial, and its purposes are unlikely to be served by retroactive application.
 
 
 18
 The remaining factors — the degree of reliance on the former rule, and the impact of retroactive application on the administration of justice — weigh heavily in favor of prospective limitation. It would be difficult to find a rule more frequently reiterated, or more abruptly overruled, than the rule in effect before Nelson. In scores of reported and unreported cases, as late as six months before we decided Nelson,[12] we had dismissed substantially identical claims because the petitioners had failed to indicate to court or counsel any desire for appeal or dissatisfaction with the trial result. Nelson broke sharply with past holdings, which were reflected in similar rulings by state courts.[13] The decisions before Nelson recognized and sanctioned what was then universally considered the extent of a lawyer's legal and moral obligation to his client, unless he personally thought an appeal should be taken. The step we took in Nelson is justified and required, we think, in its effect on future trials, but that gives no cause to brand belatedly as ineffective the past performance of many dedicated lawyers.
 
 
 19
 Unlike Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811, and Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L. Ed. 891, these are not cases where the state refused to provide the petitioners their constitutional due, or where their indigency determined whether an appeal would be taken or the effectiveness with which it would be presented if taken. Nor, unlike Williams v. Coiner, 4 Cir., 392 F.2d 210, are we presented with an attorney's abandonment of his indigent client in the face of an expressed desire for appellate review. In each case the petitioners here were represented at trial by retained or appointed lawyers who stood ready to represent them further if requested. The state, on a showing of indigency[14] and the filing of a notice of appeal, was prepared to furnish to each of them an attorney and the incidents of an appeal at its expense. The petitioners' complaints do not, in truth, present a question of the right to counsel, but of the failure to give certain specific advice which could, concededly, have been given them by others than their lawyers; we said in Nelson that the lawyer's omission could be supplied by the court. 415 F.2d 1154, 1158. And in assessing the performance of counsel in a constitutional sense, it is generally the case that it is measured by the range of competence expected of a lawyer at the time he performed the services. See McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763; Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747.
 
 
 20
 The extent of reliance on former decisions suggests also the widespread impact which retroactive application would have on the administration of justice. Nelson, at least potentially, would apply to almost every prisoner who was convicted after a plea of not guilty, and who failed to appeal. Since the prevailing practice when most of them were convicted was contrary to what is now required by Nelson, there is no reason to doubt that the courts would be obliged to order a flood of belated appeals. As a practical matter, the burden would extend far beyond a requirement of belated appeals, for in many cases, an appeal would not now be possible, due to the unavailability of a transcript and the inability of the parties to devise an acceptable substitute. And, because of the lapse of time, the burden would fall most heavily in cases in which the offenses were the most serious.[15] The same difficulties, and more, that would probably preclude the preparation of a proper record for appeal would inevitably attend efforts to conduct retrials. Witnesses on whom the state could once have relied will have died, disappeared or forgotten critical events. Evidence will have disappeared or been destroyed. The conclusion is unavoidable that retroactive application of Nelson would result in outright release of scores or hundreds of prisoners, duly convicted of grave offenses, who the states could have no way to bring to justice at this late time. Such a result is justifiable only for the most compelling of reasons,[16] which we think these cases do not present.
 
 
 21
 We hold that the rule of Nelson v. Peyton will not be given retroactive effect, and that the standards prevailing before it was announced will be applied in all cases in which the time for instituting an appeal had expired on or before June 25, 1969.
 
 
 22
 The remaining claims of the petitioners require brief mention.
 
 
 23
 In addition to the appeal question, Love contended that he was ineffectively represented by reason of his attorney's performance during the trial. The matter is fully discussed in the opinion of the district court, Love v. Commonwealth, W.D.Va., 297 F.Supp. 661, and we need not comment further, except to say that the findings are fully supported in the record.
 
 
 24
 Shiflett contended that a confession was improperly admitted at his trial. There is no hint of physical or psychological coercion. The gist of the complaint is that the recitation at trial of his statement contained a reference to information given the sheriff by his wife, to the truth of which he apparently had assented. He claims that, under Virginia law, his wife was not competent to testify and that, hence, he was denied the right to confront the witness against him.
 
 
 25
 For two reasons the argument must fail. First, it is based on an incorrect statement of Virginia law. A person is not incompetent to testify against his spouse; he can testify freely unless the spouse objects, in which event the spouse is privileged to prevent any testimony. The state sought to introduce Mrs. Shiflett as a witness but Shiflett objected. It was his objection, not her incompetency as a witness, that prevented her from being examined.[17] Second, the statement of Shiflett's wife was a necessary part of his own statement. After walking into the police station with the announcement that he had killed a man, and after the body was recovered at the place he described, Shiflett thought better of his tactics and attempted to persuade the sheriff that the killing was done in self defense. Having already talked to Mrs. Shiflett, the sheriff said that her version contradicted his. On being asked for her version, the sheriff told Shiflett what she had said to which he responded, "If that's what she said, then that's right." Admitted by the trial court as having been adopted by Shiflett, his wife's statement was necessary to give content to his indication of acquiescence. His adoption of her words made them his own.[18]
 
 
 26
 James' petition raised a number of claims other than the one discussed above. However, all but that single allegation were determined adversely to him in a prior proceeding, James v. Peyton, No. 4906 Civil, E.Va., March 21, 1967, and we find it unnecessary to consider those successive contentions.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Timberlake's co-counsel had been very recently admitted to practice, and his share of the representation appears to have been limited. In particular, he did not participate in any of the post-trial discussions with Shiflett or his parents
 
 
 [2]
 Timberlake's testimony was as follows:
 "I felt that I had been employed by them, which was a fact, and that I was answerable to them. They had employed me to represent their son, and I knew they were bearing the financial burden of it, and I for that reason undertook to keep them apprised of all developments and any views that I had." * *
 "[F]ollowing the Court's ruling on the motion to set aside the verdict and the imposition of sentence I told Mr. and Mrs. Shiflett, the parents of William Shiflett, that in my judgment the only substantial question that might afford a basis for appeal was the question having to do with the statement — the admission of the statement of Mr. Shiflett's wife made to Sheriff Kent and permitted to be introduced in evidence as the basis for an admission made to the sheriff by William Shiflett. I also told them that, of course, I could not advise them with any certainty that the ruling of the trial court would constitute a basis for reversal of the case, but that if it did it would simply entail a retrial of the case and that I frankly felt that even if there were a retrial on the evidence that was available at the first trial or at the trial. I couldn't offer them any real encouragement their son would fare materially better at a retrial. This was all general and an extended discussion, because Mr. and Mrs. Shiflett, the parents of the accused, were vitally interested in their son's welfare and in the successful defense of the charges made against him, and it was a protracted and lengthy review of the entire matter which in the final analysis resulted in my telling them that I didn't feel that the expense that would be entailed in an appeal and the further necessity if the appeal was successful of another trial would be justified by the probability of a materially different situation developing from the standpoint of their son."
 
 
 [3]
 Within four months of his conviction, he demonstrated knowledge of the availability of post conviction review on a petition for a writ of habeas corpus. He wrote to the clerk of the court about it. The clerk gave the letter to his lawyer. The lawyer responded, indicating a willingness to help him, but expressing the opinion that any attempt to reopen the matter would be futile in light of the strong case made by the state's witnesses
 
 
 [4]
 The lawyer's task in this case was made more difficult by the fact that the state's case was extremely strong. Shortly after he was retained, James confessed the killing to him, indicating that the occurrence arose out of an argument with another man. James rode a bus across town to his home, where he obtained a gun and returned, shooting the victim in view of five or six witnesses. James had given a full statement to police, and the witnesses were prepared to testify. An attempt to locate evidence tending to show self defense proved futile. A possible defense of insanity was explored without success
 
 
 [5]
 The lawyer's testimony reveals that he distinguished between the advisibility of an appeal and its cost. On the latter, he said, "I didn't discuss the cost because the record shows that it was a very small fee paid for this, and that was all they could raise, and there wasn't much point in discussing the cost of this sort of thing with them." As noted above, he stated that he would have attempted to appeal nonetheless, had he been asked to do so
 
 
 [6]
 Johnson v. New Jersey, 384 U.S. 719, 728, 86 S.Ct. 1772, 16 L.Ed.2d 882; Desist v. United States, 394 U.S. 244, 253, 89 S.Ct. 1030, 22 L.Ed.2d 248; Phillips v. North Carolina, 4 Cir., 433 F.2d 659, 662
 
 
 [7]
 E. g., Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602; United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (applied only prospectively by this court in Phillips v. North Carolina, 4 Cir., 433 F.2d 659)
 
 
 [8]
 See, e. g., Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772 (remedies under pre-Miranda law for relief from convictions based on involuntary confessions); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967 (pre-Wade remedies for unfairly suggestive line-ups); Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (pre-McCarthy [McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418] remedies for involuntary guilty pleas).
 
 
 [9]
 Decided together with the present cases but not included in the rehearing
 
 
 [10]
 Strongly suggesting that a finding of ignorance could not have been made in the case, had the matter been at issue, is the fact that he was present in the lockup with his co-defendant while their appointed attorney was discussing an appeal with the co-defendant. It is difficult to imagine that a person hearing his equally indigent co-defendant discuss an appeal with his lawyer would not infer that an appeal might be available to him as well. Clearly, had not his been the case in which we determined that a specific requirement of advice was necessary, Nelson would have been under a duty of inquiry, in default of which he would not have been entitled to relief
 
 
 [11]
 The present cases, and Love's in particular, illustrate further the irrelevance of the defendant's knowledge. Represented at trial by an appointed lawyer who twice discussed the merits of an appeal after trial without as much as hinting that an appeal would cost Love money, Love admits he knew that appeals could be taken. His explanation that with a free lawyer available and willing to advise him, he nonetheless thought he would have to pay for an appeal because of jailhouse gossip, is at best improbable. It is made even less credible by the fact that in numerous other respects his testimony was found to be fabricated. Yet despite these circumstances, he would be entitled to relief under a retroactive application ofNelson. The interests of justice would be ill served by such a result.
 
 
 [12]
 E. g., Connors v. Peyton, 4 Cir., mem. dec., No. 12,157, December 18, 1968
 
 
 [13]
 See e. g., Stokes v. Peyton, 207 Va. 1, 147 S.E.2d 773; Cabaniss v. Cunningham, 206 Va. 330, 143 S.E.2d 911
 
 
 [14]
 In two of the cases there was no way the court could have known of the need for appointed counsel on appeal, since the defendants were represented by retained counsel at trial
 
 
 [15]
 All three petitioners here, for example, stand convicted of murder. In two cases, no appeal would be possible for the reporter's notes of Shiflett's trial, and the lawyer's notes of James' trial, have been destroyed
 
 
 [16]
 Such reasons existed in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, which was applied retroactively in Pickelsimer v. Wainwright, 375 U.S. 2, 84 S.Ct. 80, 11 L.Ed.2d 41Gideon stood in a truly unique position, however. The right announced in that case furnishes the basis for the exercise of all other rights. The fundamental nature of the rule in Gideon, and the inevitably disastrous consequences to a defendant of its violation, are not comparable to the question involved in these cases. Furthermore, several other considerations not present here operated in favor of retroactive application for Gideon.
 Its impact was far less widespread than might be supposed, for practice in all but a small minority of states was already in accord with the decision long before it was announced. Only two states joined Florida urging affirmance, while twenty two joined in a brief requesting reversal. By contrast, in Nelson we found constitutionally insufficient a practice which had theretofore been almost universally accepted and followed.
 Second, unlike our decision in Nelson, Gideon was in fact no real break with the past. The decision was, or should have been, predictable. Although the former rule ostensibly was that the appointment of counsel was not constitutionally required in the absence of special circumstances, the fact was that for thirteen years before Gideon was decided the Supreme Court had not upheld a single lower court decision sustaining a failure to appoint counsel in a felony case. The last such case is Quicksall v. Michigan, 339 U.S. 660, 70 S.Ct. 910, 94 L.Ed. 1188. In cases after 1950, such as Hudson v. North Carolina, 363 U.S. 697, 80 S.Ct. 1314, 4 L.Ed.2d 1500, the Court regularly found special circumstances requiring the appointment of counsel in even the most routine felony trials. Close scrutiny of the Court's counsel cases in the decade before Gideon would have revealed that the coup de grace to Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 was imminent. That could hardly be said of our decisions just prior to Nelson.
 
 
 [17]
 Va.Code Ann. §§ 8-287, 8-288. § 8-287 expressly removes the common law disability of a spouse
 
 
 [18]
 Of course, we do not consider whether the statement was admissible as a matter of Virginia law. As we noted, Shiflett's lawyer thought the question possibly an arguable one, and that assessment finds some support in McMillan v. Commonwealth, 188 Va. 429, 50 S.E.2d 428, which states the general rule in Virginia that the extrajudicial statements of a spouse are inadmissible. However,McMillan states also that the rule is inapplicable to statements of a spouse which were adopted by the accused, and it was on this theory that Shiflett's wife's statement was admitted. As his testimony indicated, the lawyer's advice against appeal was predicated as much on the strength of the remaining evidence, and the likelihood of another conviction in the event of a retrial, as on his assessment of his chance of success on appeal.
 
 
 
 28
 WINTER, Circuit Judge, with whom SOBELOFF, Circuit Judge, joins, dissenting:
 
 
 29
 My brother Haynsworth, in writing for the majority, states the facts with respect to Shiflett, Love and James more elaborately than was thought necessary in the preparation of the previous opinion of the panel. Nevertheless, aside from the gratuitous implications that they were undoubtedly guilty or that their appeals would be lacking in merit, he, too, concludes that, although indigents, in none of the cases were the defendants advised of their right to appeal as indigents, nor were they advised of the required procedures for exercising that right under Virginia law. The conclusion is inescapable that, if applicable, Nelson v. Peyton, 415 F.2d 1154 (4 Cir. 1969), cert. den., Cox v. Nelson, 397 U.S. 1007, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970), was violated in each case.
 
 
 30
 It is perhaps a fair criticism of the panel opinion to say that by stressing the Sixth Amendment as the genesis of the Nelson rule, the opinion may be read to apply too mechanistic a test for the conclusions that the Nelson rule should be applied retroactively. As my brother Haynsworth demonstrates, retroactivity of a new rule of constitutional law is not dependent upon the particular section of the Constitution on which it is based. As recently stated in Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), "there is no inflexible constitutional rule requiring in all circumstances either absolute retroactivity or complete prospectivity for decisions construing the broad language of the Bill of Rights." Rather, there is a tripartite test: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967). See also, Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Williams v. United States, supra. And of these three factors the purpose to be served by the new standards is the most important because "[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances." (Emphasis supplied; footnote omitted.) Williams v. United States, 401 U.S. at 646, 91 S.Ct. 1148, 28 L.Ed.2d 388. See also, Desist v. United States, 394 U.S. at 249, 89 S.Ct. 1030, 22 L.Ed.2d 248.
 
 
 31
 The majority deems the rationale of the Nelson rule to be little more than the response to the need to make certain that a defendant's waiver of his right to appeal meets federal standards. See, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). While there may have been in the record in Nelson a basis to infer that the accused may have overheard the advice to his cellmate that there was a right to appeal (although not the various steps needed to be taken to perfect that right), it can hardly be said that Shiflett, Love and James had knowledge of his right to appeal as an indigent. Each denied that he knew of that right and since counsel for each admitted that he had failed to comply with Nelson, there is little likelihood that knowledge of the right and how to exercise it could be proved.
 
 
 32
 In any event, in my judgment, the majority proceeds from a false premise. Nelson is not like McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), which held that the requirement of Rule 11, F.R.Crim.P., that the district judge personally address a defendant before accepting a guilty plea or a plea of nolo contendere, must be strictly complied with, and which, in turn, was held not retroactive in Halliday v. United States, 394 U.S. 831, 89 S. Ct. 1498, 23 L.Ed.2d 16 (1969). Nelson rests more broadly on the function of an appeal as part of the search for the truth in the administration of criminal justice, and not on the more limited basis of whether there was an intelligent waiver, although the latter may be a convenient corollary to invoke in the defense of some subsequent post conviction attack where it is claimed that the right to appeal was denied. In Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), it was held to be a denial of due process and equal protection for a state to deny appellate review solely on account of a defendant's inability to pay for a transcript. There, it was stated:
 
 
 33
 All of the States now provide some method of appeal from criminal convictions, recognizing the importance of appellate review to a correct adjudication of guilt or innocence. Statistics show that a substantial proportion of criminal convictions are reversed by state appellate courts. Thus to deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside. 351 U.S. at 19, 76 S. Ct. at 590.
 
 
 34
 The subsequent decisions in Eskridge v. Washington State Board, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958); Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); and Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), ascribe no lesser role to an appeal in a criminal case. In Eskridge, in ruling invalid Washington's statute permitting a trial judge to deny a transcript to an indigent who appeals if he concludes that furnishing the transcript would not promote justice, the Court remarked, "[t]he conclusion of the trial judge that there was no reversible error in the trial cannot be an adequate substitute for the right to full appellate review * * *." 357 U.S. at 216, 78 S.Ct. at 1062. Coppedge speaks of a "right" of appeal in federal administration of criminal law and points out that an accused, purportedly denied this right, bears no burden of showing that his appeal possesses merit. 369 U.S. 447-448, 82 S.Ct. 917, 8 L.Ed.2d 21. Douglas, while recognizing that a state may withhold appellate review in the administration of its criminal justice, holds that, when the right is granted, the right must be granted to all irrespective of their ability to pay as a condition of effective exercise of the right. The implicit premise of Coppedge and Douglas is, once again, that at least one appeal is a necessary and desirable step in the search for truth. Anders, too, is another facet of the same concept. Anders requires that counsel, even though he believes that he is assigned to a meritless appeal, must serve his client by presenting all points that might arguably have merit.
 
 
 35
 What I would draw from these cases is that, while they are primarily concerned with equal protection problems and while they recognize that a state constitutionally may take the unenlightened position that no one should be permitted to appeal, they nevertheless recognize an appeal to be an essential part of any system of criminal justice for it to function as nearly perfectly as human institutions and human frailties permit. I would have no question but that an appeal goes to the very heart of the truth-finding process. From this it is only a short step to say, as we implied in Nelson v. Peyton, supra, that advice to an indigent that he has a right to appeal without cost and how to exercise that right stands on equal footing. For how else can we suppose that an indigent could exercise a right of which he is unaware and how else can the safeguards against trial error begin to function unless the defendant invokes them.
 
 
 36
 Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969), as my brother Haynsworth correctly points out, in holding other "new rules" nonretroactive rely heavily on the presence of alternative remedies to redress the deprivation of rights newly declared. Shiflett, Love and James have no other remedies unless we hold Nelson retroactive to them. The only substantial federal rights that they allege were denied were their rights under Nelson, if Nelson applies to them. Thus, they are relegated to state relief if they have been wrongly convicted. But state remedies are illusory for them, because the law of the states in this circuit is quite settled that post conviction remedies are no substitute for an appeal. See, e. g., Barbee v. Warden of Maryland Penitentiary, 220 Md. 647, 151 A.2d 167 (1959); State v. Graves, 251 N.C. 550, 112 S.E.2d 85 (1960); State v. Taylor, S.C., 178 S.E. 2d 244 (1970); Council v. Smyth, 201 Va. 135, 109 S.E.2d 116 (1969); State ex rel. Clark v. Adams, 144 W.Va. 771, 111 S.E.2d 336 (1959). The possible myriad of errors, such as insufficiency of evidence of guilt, violation of state evidentiary rules, incorrect jury charges or incorrect application of substantive state criminal law in nonjury cases, are not reviewable unless they are of sufficient magnitude to constitute a violation of federal or state constitutional rights; and here we know they are not.
 
 
 37
 I cannot presume, as does my brother Haynsworth, that few within the class to which I would make Nelson applicable would have meritorious appeals. The vast majority of the bar is highly competent and equally conscientious. Yet my experience shows that even competent lawyers are not infallible and certainly they must live with the economic realities of life. I cannot accept the irrebuttable presumption that the majority creates that every defendant was told of his right to appeal and given assistance in the exercise of that right if he had any grounds for appeal. James' court-appointed counsel may have been truthful when he testified, after the fact, that he would have appealed if he thought an appeal would be meritorious. But perhaps his failure to impart even his opinion that there were no grounds to appeal is better explained by his knowledge that the $100 paid him by James' mother at the time he was retained exhausted the family's financial resources. To me, the path of logic which converts a holding of retroactive application of Nelson into an instrument of grace solely for the benefit of the undeserving is a tortured one, indeed.
 
 
 38
 Under my view of how to apply the rules to determine retroactivity, I find it unnecessary to consider the degree of reliance on the former rule and the impact of retroactive application on the administration of justice because the factor of impairment of the truth-finding function is the overriding consideration. However, I am constrained to add two comments. First, I recognize that the decision in Nelson made a substantial change in the role of counsel in criminal cases and added significantly to their obligations. In no sense do I castigate counsel for defendants for failing to give post-Nelson advice pre-Nelson. I doubt that I would have given such advice. Yet after Nelson I would have hesitated to assert that my former client's rights should be sacrificed to my sensibilities. Second, I venture to suggest that from the standpoint of reliance on the former rule and the impact of retroactive application of Nelson on the administration of justice within the states of this circuit, retroactive application of Nelson will be less traumatic and less dislocating than the holding in Pickelsimer v. Wainwright, 372 U.S. 335, 84 S.Ct. 80, 11 L. Ed.2d 41 (1963), that Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799 (1963), be applied retroactively.
 
 
 39
 For these reasons, I would adhere to the panel decisions previously rendered.
 
 BOREMAN, Circuit Judge (concurring specially):
 
 40
 These cases were first considered and decided by a panel of three judges. I was a member of that panel. Judge Winter wrote the majority opinion in which I concurred, District Judge Lewis dissenting. 4 Cir., 433 F.2d 124.
 
 
 41
 At the risk of being charged (not undeservedly, perhaps) with vacillation or indecision, upon further reflection and consideration I am persuaded to join Chief Judge Haynsworth in his opinion prepared for the court sitting en banc and those who have indicated their acceptance of his views. Frankly, it is my usual inclination to avoid retroactive application of decisions wherever possible. Experience tends to demonstrate in so many instances the intricate, vexatious and virtually unsolvable problems which are presented in attempting to apply the principle of retroactivity to a new rule. I am impressed by Chief Judge Haynsworth's analysis of the factors which weigh so heavily in favor of prospective application of our decision in Nelson v. Peyton, 415 F.2d 1154.
 
 
 42
 In attempting to minimize my feeling of embarrassment in announcing withdrawal from my earlier position, I might derive some comfort from the statement attributed by an anonymous source to Mahatma Gandhi, the martyred Hindu nationalist leader of India. As I recall, his philosophical statement goes something like this:
 
 
 43
 My aim is not to be consistent with any previous statement I have made on a given question, but to be consistent with truth as it may present itself to me at a given moment.
 
 
 44
 I concur.