STATE OF NORTH CAROLINA v. TAMMIE LEE THOMPSON

No. 424A91

(Filed 4 September 1992)

**1. Evidence and Witnesses § 1629 (NCI4th) — tape recorded telephone conversation — no constitutional violation — no ethical violation**

The trial court did not err in a noncapital first degree murder prosecution by admitting transcripts of two tape recorded conversations between defendant and Jose Sanchez where defendant voluntarily drove from Florida to North Carolina

and was interviewed with his attorney present on 25 May 1988; defendant was not placed under arrest at the end of the interview and gave his home and work numbers to officers; Sanchez was arrested in Florida on 26 May 1988 for the murder of the victim; Sanchez implicated defendant in the murder and indicated a willingness to cooperate and to testify against defendant; the assistant district attorney in North Carolina directed an SBI agent in Florida to ask Sanchez if he would call defendant and have the call recorded in an attempt to incriminate defendant; Sanchez agreed and made the call; the assistant district attorney felt that a second call might be more incriminating; a second call was made; and law enforcement officers told the assistant district attorney after the arrest that, when they read the warrant to defendant, defendant's mother immediately produced a letter purportedly written by an attorney dated 24 May 1988 stating that he represented defendant and that defendant was not to be questioned without the attorney being present. Defendant was not in custody at the time the telephone calls were made and was therefore not entitled to *Miranda* warnings; no adversarial judicial proceedings had commenced against defendant and his Sixth Amendment right to counsel had not attached; and the evidence amply supports the trial court's findings and conclusions that the conduct of the assistant district attorney and the officers was not unethical and that they had acted in a good faith belief that defendant was still amenable to maintaining contact with them.

**Am Jur 2d, Evidence § 436.**

**Admissibility, in criminal prosecution, of evidence secured by mechanical or electronic eavesdropping device. 97 ALR2d 1283.**

2. **Evidence and Witnesses § 1088 (NCI4th)— recorded telephone conversation with defendant—implied admissions—tapes and transcripts admissible**

The trial court did not err in a noncapital first degree murder prosecution by denying defendant's motion to suppress tapes and transcripts of two telephone conversations pursuant to N.C.G.S. § 8C-1, Rule 801(d)(B), the implied admission rule. A portion of the telephone conversations did constitute an implied admission; there is no question that defendant could hear

STATE v. THOMPSON

[332 N.C. 204 (1992)]

and understand Sanchez, with whom he was talking; Sanchez clearly had firsthand knowledge of the circumstances contained in the telephone conversations between defendant and himself; and, given the gravity of the implications flowing from Sanchez's questions, the appropriate response for defendant in the instant case would have been an unequivocal denial of guilt, or at least an expression of surprise or confusion.

**Am Jur 2d, Evidence § 638; Homicide § 339.**

**Impeachment of defendant in criminal case by showing defendant's prearrest silence—state cases. 35 ALR4th 731.**

3. **Evidence and Witnesses § 1617 (NCI4th)— murder—telephone call tapes and transcripts—contemporaneous introduction of transcript of prior interview denied—no abuse of discretion**

The trial court did not abuse its discretion in a noncapital murder prosecution by denying defendant's motion to require the State to introduce defendant's prior interview contemporaneously with the tapes and transcripts of telephone calls with Sanchez, who did the actual killing, or by failing to instruct the jury regarding Sanchez's subsequent recantation at his own trial contemporaneously with the State's introduction of the recorded telephone calls. Defendant did not demonstrate that the tapes and transcripts of the two telephone calls were somehow out of context when they were introduced into evidence or that the prior interview was either explanatory of or relevant to the telephone calls. It was defendant's responsibility, not the State's, to introduce evidence about his exculpatory interview. N.C.G.S. § 8C-1, Rule 106.

**Am Jur 2d, Evidence §§ 436, 599.**

4. **Evidence and Witnesses § 1481 (NCI4th)— murder—pistol found several miles from murder scene—photograph of pistol— admissible**

The trial court did not err in a noncapital murder prosecution by admitting into evidence a pistol found several miles from the murder scene and a photograph of the pistol where the circumstantial evidence showing the connecting factors was sufficient to render the gun and photograph relevant and admissible. Moreover, the prejudicial effect of the admission

STATE v. THOMPSON

[332 N.C. 204 (1992)]

of the gun and photograph did not outweigh their probative value.

**Am Jur 2d, Homicide §§ 414, 416.**

5. **Evidence and Witnesses § 1745 (NCI4th) — drawings of crime scene by codefendant — codefendant refused to testify — hearsay — no prejudice**

Any error in introducing crime scene sketches by a nontestifying codefendant in a murder prosecution was harmless where, assuming that the sketches were inadmissible hearsay, the information in the sketches had already been testified to in great detail by other witnesses. Also, although not requested by defendant when the sketches were introduced, the trial court nevertheless gave a limiting instruction in its charge to the jury.

**Am Jur 2d, Evidence § 802; Homicide § 415.**

6. **Constitutional Law § 355 (NCI4th) — murder — codefendant awaiting appeal of conviction — State informed that Fifth Amendment would be invoked — State allowed to call as witness**

The trial court did not err in a noncapital first degree murder prosecution by allowing the State to call as a witness a codefendant awaiting appeal of his conviction even though the State and the court had been informed that the codefendant would invoke the Fifth Amendment and would not answer questions. The prosecutor's case would have been seriously prejudiced by failure to offer the codefendant as a witness in light of his role in the murder.

**Am Jur 2d, Criminal Law §§ 703, 937.**

**Propriety and prejudicial effect of prosecution's calling as witness, to extract claim of self-incrimination privilege, one involved in offense charged against accused. 19 ALR4th 368.**

Justice LAKE did not participate in the consideration or decision of this case.

Justice MITCHELL concurring.

APPEAL by defendant as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Ellis, J.,* at the 28 January 1991 Special Session

**STATE v. THOMPSON**

[332 N.C. 204 (1992)]

of Superior Court, JONES County, upon a verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 15 April 1992.

*Lacy H. Thornburg, Attorney General, by Valerie Spalding, Assistant Attorney General, for the State.*

*William J. Morgan for defendant-appellant.*

FRYE, Justice.

Defendant, Tammie Lee Thompson, was indicted on one count of first-degree murder by a Duplin County grand jury. By consent of the parties and with court approval, venue was changed from Duplin County to Wake County. Defendant was tried twice in Wake County; in each trial, the jury deadlocked and a mistrial was ordered. Again by consent of the parties and with court approval, venue was changed from Wake County to Jones County. Defendant was tried noncapitally to a jury, which returned a verdict of guilty of murder in the first degree. The trial judge imposed the mandatory sentence of life imprisonment. Defendant gave notice of appeal to this Court on 7 February 1991.

Defendant brings forward several assignments of error. After a thorough review of the record, we conclude that defendant received a fair trial, free of prejudicial error.

I.

The State presented evidence tending to show the following facts and circumstances:

On Monday, 23 May 1988, the body of Raymond McKay (the victim) was found lying between a truck and a car in the parking lot of an abandoned store in the southwest corner of the intersection of North Carolina Highway 111 and Rural Paved Road 1803 known as "Lyman's Crossroads" in Duplin County.

Cecil Davis, a self-employed carpenter, testified that the victim worked for him as a framer. In May, 1988, Davis was framing small houses in the Wilmington area, about sixty miles from Lyman. He and the victim would meet at Lyman's Crossroads in the mornings in order to travel to work together. On 23 May, Davis and the victim met around 6:10 a.m. While waiting for the rest of the construction crew to arrive, Davis left the victim waiting in

the victim's car while Davis went to help his father with a van that would not start. Davis was gone for about thirty minutes. When he returned, he saw the victim lying on the ground, with a wound to his head. Davis noticed that McKay's car had been moved approximately fifty feet towards the main road, and that the victim's body was now lying where his car had originally been parked. Davis identified various photographs of Lyman's Crossroads, and used them to illustrate his testimony to the jury.

Several witnesses, including Jimmy Register, Mary Ann Futrell and Dianne Miller, testified that at approximately 6:15 a.m. on 23 May, while on their way to work, they saw the victim talking to a person seated in the driver's side of a car which appeared to be a yellow Monte Carlo or Grand Prix. Register, with the aid of a previously identified and admitted exhibit depicting Lyman's Crossroads, testified to the position of the cars located at the scene of the crime. Futrell, with the aid of a sketch that she had drawn previously, testified to the position of the victim in relation to the yellow car. Miller testified that she heard two gunshots and saw a man who had been standing by the yellow car fall. Another witness, Bernice Bryant, who lived near Lyman's Crossroads, testified that she heard three gunshots in rapid succession.

Dr. Walter Gable testified as an expert in forensic pathology. He performed an autopsy on the victim and determined that the cause of death was a gunshot wound to the head. In Dr. Gable's opinion, the wound to the head was caused by a large caliber pistol and was consistent with either a .38 caliber or .357 Magnum. No bullets, shell casings, or lead fragments were found in the body or at the scene.

Earl Thomas testified that he was at a service station in Beulaville on Sunday, 22 May, at approximately 7:30 a.m. and talked with a man who came into the store asking for directions to Lyman's Crossroads. The man showed Thomas a road map and a handwritten map. Thomas had difficulty understanding the man because he did not speak English well. The man was dark skinned, drove a yellow two-door Oldsmobile, and was alone.

Dale Tucker, who was employed by the North Carolina Department of Transportation, testified that he found a pistol in a ditch on Highway 24 about one and a half miles west of Beulaville during the morning of 25 May while he and a co-worker were removing a tree that had been blown down the previous night during a

severe storm. The pistol was a .38 caliber revolver and had three live cartridges and three spent cartridges in it. Tucker gave the pistol to the Duplin County Sheriff's Department later that evening.

State Bureau of Investigation (S.B.I.) Agent Bruce Kennedy testified that he had conducted an investigation of the victim's murder. His investigation revealed that a slender, dark-skinned male driving a yellow car had been seen in the general vicinity of Lyman's Crossroads, but no license plate number from the car had been obtained. The investigation also revealed that the victim had been romantically linked with Joy Thompson, defendant Tammie Thompson's wife, while the victim was in Florida working for defendant, and that Joy Thompson and the victim had both left Florida for North Carolina some weeks before the murder.

Agent Kennedy's investigation revealed that defendant had been working in Florida on the morning of 23 May. Of the six men who worked with defendant in his roofing business, one of them, Eduardo Pellot, owned a yellow Oldsmobile Cutlass, and only one of them, Jose Sanchez,[1] also known as Pepe, was not working that day. Later testimony revealed that Sanchez had borrowed Pellot's car after telling him that he was going to Disney World. A check of various motels indicated that someone using the name "Jose Sanchez" registered at Days Inn in Jacksonville, North Carolina at 11:18 p.m. on Saturday, 21 May, and checked out of the motel early Monday morning, 23 May, the morning of the murder. The registering person's driver's license identified him as Jose Sanchez, and the vehicle was later found to be registered to Eduardo Pellot.

Eunice Polloway, an employee of Southern Bell Telephone, identified some customer service records for the telephone number assigned to defendant's Florida address. Polloway testified that a collect call was made from a Jacksonville, North Carolina Days Inn on 22 May 1988 to defendant's number in Florida. She also testified that six short calls were made from defendant's number to the victim's number.

---

1. In *State v. Sanchez*, 328 N.C. 247, 400 S.E.2d 421 (1991), this Court reversed Jose Sanchez' conviction of first-degree murder on the ground that the trial court erred in excluding expert testimony about the defendant's ability to understand the *Miranda* warnings. At his second trial, on 23 January 1992, after the jury was impaneled but before evidence was presented, Sanchez pled guilty to second degree murder and received a life sentence.

On Wednesday, 25 May, Agent Kennedy and Detective Jimmy Smith interviewed defendant in the Duplin County Sheriff's Department. The interview, conducted with defendant's attorney William Morgan present, lasted approximately two and one-half hours. At the end of the interview defendant, who had voluntarily driven to North Carolina from Florida, was not placed under arrest. Defendant gave the officers his home and work telephone numbers, and said he could be reached at a local number prior to his departure from North Carolina.

Joy Thompson, defendant's wife, testified that she and defendant had significant marital problems and were fighting over custody of the children after they had separated. She testified that she and the victim had been having an affair. She testified that on 10 May, the victim received a phone call from someone identifying himself as defendant and an argument ensued between the two. On 22 May, the evening before the murder, Joy Thompson called her husband, who told her that "something terrible was fixing to happen" and that when it did she would know it. Joy Thompson then called the victim to warn him. The victim responded that he was "a big boy" and could take care of himself. The next day Joy Thompson received a call from her cousin saying the victim had been killed. Joy Thompson called the sheriff's department and told them that defendant had either killed the victim himself or had someone do it for him.

On 26 May, Agent Bernie Mortonson of the Florida Department of Law Enforcement located Eduardo Pellot and his vehicle in Juno Beach, Florida. A consent search was done of the vehicle, and fingerprints were lifted. In the passenger side of the vehicle was a road atlas, which automatically opened up to a page containing the North Carolina map, upon which was a pencil mark on Interstate 95 indicating a turn at Fayetteville into the Duplin County area. A fingerprint from the road atlas was identified as that of Jose Sanchez. Sanchez was later arrested at his apartment. He was transported to the local police department where he gave a statement implicating defendant in the murder. Sanchez indicated a willingness to cooperate, and even to testify against defendant. Assistant District Attorney Dewey Hudson of Duplin County directed Agent Bruce Kennedy to ask Sanchez if he would be willing to make a controlled telephone call to Thompson. Sanchez agreed and gave written permission to record the telephone conversation. Believing that the first call was not sufficiently inculpatory of de-

fendant, Hudson had Sanchez make a second call. Thereafter, an arrest warrant was obtained and defendant was arrested at 1:30 a.m. on 27 May. At the time of his arrest, defendant's mother produced a letter dated 24 May which stated that defendant was not to be questioned without William Morgan being present.

Chris Dutton testified that he had been incarcerated with defendant at the Hoke County prison unit where they became friends. Dutton testified that he and defendant had several conversations about their charges. He testified that defendant told him that his wife had left him and was now testifying against him because he had had her boyfriend killed. According to Dutton, defendant paid "Pepe" (Jose Sanchez) $200 for the car trip to North Carolina. Defendant was to add $100 per week to Sanchez' regular paycheck. Dutton testified that he had not been threatened or promised anything by the State's attorneys in exchange for testifying against defendant. He had, however, entered into a plea bargain with the district attorney for the 30th prosecutorial district in which he would plead guilty to a lesser crime in exchange for testifying against defendant. Dutton was then cross-examined extensively concerning his past and present criminal record, which included providing false information to law enforcement officers.

Additional evidence will be discussed as it becomes relevant to a fuller understanding of the specific issues raised on appeal.

Defendant did not testify or present evidence.

## II.

[1]  In his first assignment of error, defendant contends that the trial court erred in denying his pretrial motion to suppress two tape-recorded telephone conversations and transcripts thereof between Jose Sanchez and himself. Defendant argues that his motion to suppress should have been granted because the tape-recorded telephone conversations were obtained "through fraudulent and impermissible conduct on behalf of law enforcement officers acting on behalf of the [assistant] district attorney." Defendant argues that the two telephone calls made to him by Jose Sanchez at the behest and under the supervision of law enforcement officials violated his Fifth Amendment right against self-incrimination because *Miranda*[2] warnings were not read to him prior to the telephone

2. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

STATE v. THOMPSON

[332 N.C. 204 (1992)]

conversations. Defendant further argues that D.R. 7-104(A)(1) of the American Bar Association's Code of Professional Responsibility and Rule 7.4(A) of the North Carolina Rules of Professional Conduct were violated because Assistant District Attorney Dewey Hudson contacted defendant directly through police officers who knew that defendant was being represented by counsel.

The State responds that defendant's right to *Miranda* warnings was not violated because *Miranda* warnings are not required unless a custodial interrogation is about to begin, and no such custodial interrogation occurred here. The State argues further that the trial court's findings of fact and conclusions of law that Assistant District Attorney Hudson and the police officers under his supervision acted in good faith and committed no ethical violations are supported by competent evidence and should be upheld. We agree with the State.

The relevant facts surrounding defendant's first assignment of error are as follows: On 26 May 1988, Jose Sanchez was arrested in Florida for the murder of the victim, Raymond McKay. Sanchez was transported to the local police department, where he was interviewed for about one hour and fifteen minutes. During the interview, Sanchez implicated defendant in the murder and indicated a willingness to cooperate and to testify against defendant. Assistant District Attorney Dewey Hudson, who was in North Carolina, directed Agent Bruce Kennedy by telephone to ask Sanchez if he would agree to call defendant, in an attempt to incriminate him, and have the call recorded. Sanchez agreed and made the first call. The officers played the tape of the telephone conversation to Hudson over the telephone. Hudson felt the conversation was "somewhat incriminating" but decided that a second call might be more incriminating. A second call was made. The substance of the second call was played back to Hudson, who thereafter was convinced that sufficient evidence existed to charge defendant with murder. After defendant was arrested, Hudson spoke to Agent Kennedy and Detective Jimmy Smith, who told him that when they read the warrant to defendant, defendant's mother immediately produced a letter purportedly written by Attorney William Morgan. The officers read the letter to Hudson. The letter, dated 24 May 1988, stated that Morgan was representing defendant and that he was not to be questioned without Morgan being present.

STATE v. THOMPSON

[332 N.C. 204 (1992)]

Defendant first argues that the telephone calls made by Sanchez at the behest of police officers amounted to an interrogation of defendant requiring *Miranda* warnings. We disagree. It is well settled that *Miranda* warnings are not required when the defendant is not being subjected to custodial interrogation. *State v. Phipps*, 331 N.C. 427, 442, 418 S.E.2d 178, 185 (1992). The test for whether a person is "in custody" for *Miranda* purposes is whether a reasonable person in the suspect's position would believe that he is being deprived of his freedom of action in a significant way or, to the contrary, would believe that he is free to go at will. *Id.* In the instant case, defendant does not argue, nor is there any evidence which suggests, that defendant was in custody at the time the telephone calls were made. In fact, the telephone calls were made from the police station to defendant's home. Moreover, there is no indication that defendant did not feel free to terminate his telephone conversations with Sanchez at any time. We hold that defendant was not in custody at the time the telephone calls were made to him and was therefore not entitled to *Miranda* warnings.

We also note, contrary to the implicit assertions underlying defendant's contention, that none of defendant's other constitutional rights were violated at the time Sanchez made the two telephone calls to him. First, defendant concedes, and we agree, that his Sixth Amendment right to counsel had not attached at the time of the telephone calls because no adversary judicial proceedings had been commenced against him. *See State v. Bromfield*, 332 N.C. 24, 39, 418 S.E.2d 491, 499 (1992); *State v. Nations*, 319 N.C. 318, 354 S.E.2d 510 (1987). Nor were defendant's rights under the Fourth Amendment violated by the introduction into evidence of the tape recordings made by the police of the telephone conversations between Sanchez and defendant. *See United States v. White*, 401 U.S. 745, 752, 28 L. Ed. 2d 453, 459 (1971) ("If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case.").

Defendant next argues under this assignment of error that the telephone conversations were the result of intentionally misleading, fraudulent and unethical conduct on the part of Assistant District Attorney Hudson and the police officers who contacted defendant directly, in violation of D.R. 7-104(A)(1) of the A.B.A.'s Code of Professional Responsibility and Rule 7.4(A) of the N.C.

Rules of Professional Conduct, although he was being represented by counsel. The State responds that neither the assistant district attorney nor the officers engaged in fraudulent or impermissible conduct in having Sanchez agree to and make two recorded telephone calls to defendant, and, accordingly, the trial court did not err in denying defendant's motion to suppress the tapes and transcripts of the calls. We agree with the State.

It is well settled that a trial court's findings of fact are binding on appeal when supported by competent evidence. *State v. Ross*, 329 N.C. 108, 123, 405 S.E.2d 158, 166 (1991). In the instant case, prior to denying defendant's motion to suppress, the trial court found as fact that "there was no evidence indicating that either Mr. Hudson or any of the officers acting under his direction acted in any manner designed to circumvent any rights of the defendant," and that "it was not fraudulent misconduct on the part of the State that led to the defendant . . . making certain comments to Sanchez during the taped telephone conversations but was rather his voluntary engaging in conversation and his willingness to discuss the issues raised by Sanchez during the phone conversations." The trial court concluded that "the reasonable interpretation of the totality of circumstances surrounding the meeting on May 25, 1988 indicated that the defendant Thompson was willing to cooperate and that the defendant Thompson was not foreclosing additional contact between himself and the law enforcement officers." Therefore, "Mr. Hudson did not violate either DR7-104(a)(1) of the American Bar Association's Code of Professional Responsibility or Rule 7.4(a) of the North Carolina Rules of Professional Conduct and . . . the defendant's statements made on the taped phone conversations were not the product of unethical conduct." The trial court concluded further that "the taped conversations were not the product of any misconduct on the part of the agents of the State of North Carolina and did not amount to any due process violation of the, defendant." The evidence presented at the suppression hearing supports the trial court's findings and conclusions.

Assistant District Attorney Hudson testified at the suppression hearing that he thought Attorney William Morgan had been representing defendant solely for purposes of the interview conducted in Duplin County on 25 May, two days after the murder. Hudson thought that Morgan's representation of defendant was in a limited capacity because defendant was a resident of Florida. Hudson testified that he learned otherwise by virtue of the letter,

dated 24 May, that was presented to police officers at the time of defendant's arrest. Special Agent Kennedy testified that he too believed that Morgan was representing defendant for the limited purpose of the Duplin County interview. He testified that he likewise learned otherwise when the letter was produced during his presence at defendant's arrest in Florida. Agent Kennedy testified that at the end of the Duplin County interview, defendant gave the officers his home and work telephone numbers, and said he could be reached at a local number prior to his departure from North Carolina. We conclude that the above evidence amply supports the trial court's findings of fact and conclusions of law that the conduct of Assistant District Attorney Hudson and the police officers was not unethical and that Hudson and the officers acted with a good faith belief that defendant was still amenable to maintaining contact with them. Accordingly, the trial court did not err in denying defendant's motion to suppress.

[2] In his second assignment of error, defendant contends that the trial court erred in denying his motion to suppress the tapes and transcripts of the two telephone conversations pursuant to N.C.G.S. § 8C-1, Rule 801(d)(B). Defendant argues that the requirements of Rule 801(d)(B), the "implied admission" rule, were not met. N.C.G.S. § 8C-1, Rule 801(d) provides in pertinent part:

(d) Exception for Admissions by a Party-Opponent.—A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual capacity or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth[.]

N.C.G.S. § 8C-1, Rule 801(d) (1988).

Relying on this Court's decision in *State v. Spaulding*, 288 N.C. 397, 219 S.E.2d 178 (1975), *judgment vacated in part*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976), which was decided prior to the adoption of the North Carolina Rules of Evidence in 1984, defendant argues that the following requirements must be met before the silence or failure of a defendant to deny a statement may be admissible against him as an implied admission:

(1) The statement must be made in the defendant's presence;
(2) The statement must be made by a person having firsthand knowledge of the facts contained in the statement; (3) The

statement must be made under such circumstances that a denial would be naturally expected if the statement were untrue; (4) The defendant must be in a position to hear and understand what was said; and (5) The defendant must have had the opportunity to speak.

*Id.* at 406, 219 S.E.2d at 183. Defendant argues that the absence of elements (1) and (2) above prohibits the use of his responses as an implied admission. Defendant argues further that his responses to Sanchez' questions on the telephone did, in fact, constitute a denial of any implication of himself in the murder of the victim.

The State responds that the requirements of Rule 801(d)(B) were met and that, while a denial would have been natural to the questions asked by Sanchez of defendant if defendant were innocent, no such denial occurred. In its brief, the State set forth the following relevant portion of the recorded telephone calls between Sanchez and defendant in support of its argument that defendant's responses amounted to an implied admission of his guilt:

Pepe [Sanchez]: I have tomorrow a my money, I need at least tomorrow. You told me, me go to North Carolina kill a Raymond, I kill him, now I need a my money for me leave.

Tammie [defendant]: Uh-huh.

Pepe: You give a me my money tomorrow?

Tammie: I'll have your check for you tomorrow—

Pepe: No my—

Tammie: For which you work.

Pepe: No—

Tammie: Yeah.

Pepe: No my money for killing Raymond.

Tammie: Yeah.

Pepe: You have my money?

Tammie: Yeah.

We agree with the State that the above portion of the telephone conversations between Sanchez and defendant constitutes an implied admission as contemplated by Rule 801(d)(B). We also agree

with the State that the requirements of Rule 801(d)(B) and *Spaulding* are satisfied and that, contrary to what defendant argues, defendant did not, in fact, deny his guilt.

In *Spaulding*, this Court held that the failure of the defendant to deny a statement made in his presence by a co-defendant and implicating him in a murder was not an implied admission of his guilt because there was no evidence that the defendant was in a position to hear or understand the statement and make a denial since the defendant was at a table some distance away talking to other people at the time the statement was made. *Spaulding*, 288 N.C. at 406, 219 S.E.2d at 184. Defendant contends that *Spaulding* and other cases require that the person making the statement be in the physical presence of the defendant. We disagree. We believe that the proper focus is on the defendant's ability to hear and understand the statement being made to him. Unlike in *Spaulding*, in the instant case, based upon the above-quoted transcript of the telephone conversations, there is no question that defendant could hear and understand Sanchez, whom defendant had known and worked with for a number of years. We conclude, therefore, that the requirement that the statement be made in defendant's presence was satisfied in the instant case.

Defendant also argues that the second requirement of firsthand knowledge was not met because Sanchez was "a person of limited intelligence and dependent personality," who made telephone calls consisting of pre-programmed and pre-planned questions created by the police officers. We disagree. At the time of his arrest, Sanchez gave a detailed statement about the murder which implicated defendant. Based on his statement, Sanchez was asked to make two telephone calls to defendant. It seems clear that the questions which formed the basis of the telephone conversations were created as a result of and designed to conform to Sanchez' initial statement. In that respect, we believe, Sanchez clearly had firsthand knowledge of the circumstances contained in the telephone conversations between defendant and himself.

We also disagree with defendant that the tapes and transcripts show that defendant, in fact, denied his guilt. The Official Commentary to Rule 801(d) reads in part:

Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement

made in his presence, if untrue. The decision in each case calls for an evaluation in terms of probable human behavior.

N.C.G.S. § 8C-1, Rule 801(d) official commentary (1988). Given the gravity of the implications flowing from Sanchez' questions, the appropriate response for defendant in the instant case, if he were indeed innocent, would have been an unequivocal denial of his guilt, or at least an expression of surprise or confusion. A response which is not the equivalent of a denial may indicate acquiescence and be considered by the jury for what it is worth. *E.g., State v. Peterson*, 212 N.C. 758, 194 S.E. 498 (1938). Where the evidence leaves the matter in doubt, it is the jury's province to determine whether the remarks were heard and understood, and to draw inferences from the person's silence. *State v. Martin*, 182 N.C. 846, 109 S.E. 74 (1921). For the reasons stated above, we hold that the trial court did not err in denying defendant's motion to suppress the tapes and transcripts.

**[3]** Defendant next assigns error to the trial court's denial of his motion to require the State to introduce a transcript of defendant's 25 May 1988 interview in Duplin County contemporaneously with the tapes and transcripts of the phone calls. Defendant relies upon N.C.G.S. § 8C-1, Rule 106 for support. That rule provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

N.C.G.S. § 8C-1, Rule 106 (1988). We find defendant's contention to be without merit.

While we have found no decisions of this Court which are instructive on this point, we note that the federal rule is identical to our rule and has been the subject of many federal decisions. This Court frequently looks to federal decisions for guidance with regard to the Rules of Evidence. *See, e.g., State v. Smith*, 315 N.C. 76, 337 S.E.2d 883 (1985).

The lessons of the federal decisions discussing Rule 106 are well settled. Rule 106 codifies the standard common law rule that when a writing or recorded statement or a part thereof is introduced by any party, an adverse party can obtain admission of the entire statement or anything so closely related that in fairness

STATE v. THOMPSON

[332 N.C. 204 (1992)]

it too should be admitted. The trial court decides what is closely related. *United States v. Burreson*, 643 F.2d 1344 (9th Cir.), *cert. denied*, 454 U.S. 847, 70 L. Ed. 2d 135 (1981). The standard of review is whether the trial court abused its discretion. *United States v. Abroms*, 947 F.2d 1241 (5th Cir. 1991), *cert. denied*, --- U.S. ---, 120 L. Ed. 2d 869 (1992). "The purpose of the 'completeness' rule codified in Rule 106 is merely to ensure that a misleading impression created by taking matters out of context is corrected on the spot, because of 'the inadequacy of repair work when delayed to a point later in the trial.'" *United States v. LeFevour*, 798 F.2d 977, 981 (7th Cir. 1986) (quoting Advisory Committee Note).

Federal decisions also make clear that Rule 106 does not require introduction of additional portions of the statement or another statement that are neither explanatory of nor relevant to the passages that have been admitted. *See, e.g., United States v. Walker*, 652 F.2d 708 (7th Cir. 1981) (trial court properly admitted parts of defendant's grand jury testimony and excluded other portions); *accord United States v. Garrett*, 716 F.2d 257 (5th Cir. 1983), *cert. denied*, 466 U.S. 937, 80 L. Ed. 2d 459 (1984); *United States v. Crosby*, 713 F.2d 1066 (5th Cir.), *cert. denied*, 464 U.S. 1001, 78 L. Ed. 2d 696 (1983).

Applying these principles to the instant case, in sum, defendant must demonstrate that the tapes and transcripts of the two telephone calls were somehow out of context when they were introduced into evidence, and he must also demonstrate that his Duplin County interview was either explanatory of or relevant to the telephone calls. Defendant does neither. First, there is no indication that the tapes and transcripts were introduced other than as a whole. Second, defendant has not shown how the Duplin County interview was either explanatory of or relevant to the telephone calls. Defendant's 25 May interview with the Duplin County Sheriff and other investigating officers was basically exculpatory. As defendant states in his brief, the interview was a clear denial of any implication or involvement in the victim's death. The telephone conversations, however, were inculpatory. At the time of defendant's interview on 25 May, Sanchez had neither been located nor arrested. The idea of placing recorded telephone calls to defendant arose after Sanchez' arrest on the morning of 27 May. There appears to be no nexus between defendant's prior exculpatory interview and the subsequent telephone calls made to him by Sanchez. This situation clearly falls outside the parameters of Rule 106. It was defendant's

responsibility, not the State's, to introduce evidence about his exculpatory interview. *See* Advisory Committee Note to Rule 106 (Rule 106 "does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case."). We hold, therefore, that the trial court did not abuse its discretion in denying defendant's motion to require the State to introduce defendant's 25 May interview contemporaneously with the tapes and transcripts of the telephone calls.

In his fourth assignment of error, defendant contends that the trial court erred in failing to instruct the jury regarding Sanchez' "subsequent recantation" at his own trial contemporaneously with the State's introduction of the recorded phone calls. Defendant again relies on Rule 106 in support of his contention, arguing that "the State was allowed to selectively introduce vague and 'inherently dangerous' phone conversations without being required to introduce the previous denial of [defendant] or the subsequent recantation by Sanchez." For reasons similar to those stated in response to the preceding argument, we reject this assignment of error.

[4]   Defendant next contends, in his fifth assignment of error, that the trial court erred in denying his motion to exclude the pistol and the photograph of the pistol from evidence. Defendant made a pre-trial motion to exclude all evidence of the pistol found several miles from the murder scene and the photograph of the pistol shown to Sanchez. Defendant renewed this motion at trial. The trial court denied the motion. The State presented the testimony of Dale Tucker, who found the gun in a ditch after a severe storm, and of Agent Kennedy, who showed the photograph of the gun to Sanchez while interviewing him in Florida.

First, defendant argues that the evidence was irrelevant and lacked a sufficient evidentiary basis. However, the circumstantial evidence surrounding the gun was plentiful. Dr. Walter Gable testified that, in his opinion, the fatal wound to the victim's head was caused by a large caliber pistol, consistent with either a .38 caliber or .357 Magnum. Dale Tucker, an employee of the North Carolina Department of Transportation, testified that he found a .38 caliber revolver in a ditch on a road leading to Lyman's Crossroads two days after the murder. The gun contained three spent cartridges and three that had not been fired. The gun's condition demonstrated that it had not been exposed to the elements for any great length of time. Fingerprints could not be lifted from

the gun's surface because they were smudged. A witness who lived near the scene of the crime testified that she heard three gunshots in rapid succession. We hold that this circumstantial evidence showing connecting factors—spent cartridges, the caliber, the location and the short time lapse before discovery—was sufficient to render the evidence of the gun and the photograph relevant and admissible. *State v. King*, 287 N.C. 645, 215 S.E.2d 540 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1209 (1976).

Moreover, we disagree with defendant that the prejudicial effect of the admission of the gun and the photograph of the gun into evidence far outweighed their probative value. *See generally* N.C.G.S. § 8C-1, Rule 403 (1988). Such a determination rests in the sound discretion of the trial court. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986). Defendant has failed to show that the trial court abused its discretion in denying his motion to exclude the gun and the photograph of the gun from evidence.

[5] In his sixth assignment of error, defendant contends that the trial court erred in admitting into evidence sketches of the crime scene drawn by or upon by Jose Sanchez. Defendant argues that these sketches should have been excluded as hearsay not fitting into any recognized exception to the hearsay rule, and that their admission into evidence deprived him of his constitutional right of confrontation. During the trial, the State called Sanchez to the stand. Sanchez gave his name and date of birth, and then invoked the protection of his Fifth Amendment privilege not to testify further. Subsequently, the State called Agent Bruce Kennedy, who identified two drawings Sanchez had made: one of the murder scene, and one showing the local highways in the vicinity of Lyman's Crossroads. Agent Kennedy also identified an official crime scene sketch prepared by Detective Jimmy Smith, which Sanchez had modified to show the position of his vehicle and the fact that the victim's car door was found open.

Assuming, *arguendo*, that the sketches are inadmissible hearsay and that the question of their admission into evidence is one of constitutional magnitude, we conclude that the State has met its burden of demonstrating that the error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1988).

A review of the transcript discloses that other witnesses— Cecil Davis, Jimmy Register, Mary Ann Futrell, and Dianne Miller— had previously testified, without objection, to the physical details

of the murder scene. By the time the sketches were introduced, these witnesses had used photographs of the murder scene to describe their testimony. The witnesses testified, in accordance with the sketches, to the exact position of all the vehicles, including the yellow car Sanchez was driving. Some witnesses testified that they observed the victim leaning on Sanchez' car talking to the occupant. There was also testimony regarding the position of the victim after he had been shot; the fact that his car had been moved from its original position and that its driver's door was open; and the location of the roads and highways leading to Lyman's Crossroads, the direction of nearby towns, and the buildings at the crossroads. In short, the information contained in the sketches had already been testified to in great detail by other witnesses. We note that although defendant failed to request a limiting instruction at the time the sketches were introduced, the trial court nevertheless gave such an instruction in its charge to the jury. We conclude that any error in admitting the sketches into evidence was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443.

[6] In his seventh and final assignment of error, defendant contends that the trial court erred in allowing the State to call Sanchez to the witness stand when it knew that Sanchez was intending to invoke his Fifth Amendment right against self-incrimination. At the time of defendant's trial, Sanchez was awaiting appeal on his first-degree murder conviction. Through his appellate counsel, Sanchez informed the trial court and the State that he would not answer any questions and would invoke the Fifth Amendment. The trial court nonetheless allowed the State to call Sanchez to the witness stand in the presence of the jury to require him to give his name and invoke his rights. We believe that this was permissible because the prosecutor's case would be "seriously prejudiced" by failure to offer Sanchez as a witness in light of Sanchez' role in the murder. *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980); *see also State v. Bumgarner*, 299 N.C. 113, 261 S.E.2d 105 (1980). Thus, we hold that the trial court did not err in allowing the State to call Sanchez as a witness.

For the foregoing reasons, we hold that defendant's trial was free of prejudicial error.

No error.

Justice LAKE did not participate in the consideration or decision of this case.

Justice MITCHELL concurring.

I concur in the decision of the majority. To avoid any lingering confusion on the part of any lawyer or law student in North Carolina, however, I wish to point out that the American Bar Association's Code of Professional Responsibility does not have the force of law and is not binding on anyone. Therefore, it is not necessary for this Court to consider whether the prosecutors or police officers violated that code in the present case since the answer to any such inquiry is irrelevant.