# Richmond

## HARRY W. SANDERS v. LUCIUS NEWSOME.

April 13, 1942.

Record No. 2507.

Present, All the Justices.

The opinion states the case.

*John J. Wicker, Jr.* and *John B. Boatwright, Jr.*, for the plaintiff in error.

*R. Hugh Rudd*, for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

Plaintiff, Lucius Newsome, alleged, in his notice of motion, that he was struck and seriously injured by a car operated by H. W. Sanders. The defense to this allegation was, (1) that defendant's car did not strike plaintiff, and (2) that plaintiff failed to prove that defendant was negligent. On these issues the jury returned a verdict for plaintiff in the sum of $3,500, on which the trial court entered judgment. From that judgment defendant obtained this writ of error.

Two of the four assignments of error are based on the contention that the evidence is insufficient to support the verdict. This contention necessitates a careful study of the evidence.

In the trial court the burden was on plaintiff to establish two facts: (1) That he was struck by a car operated by defendant, and (2) that defendant was negligent in the operation of his car, which negligence was the proximate cause of the injuries sustained. In this court plaintiff's position, fortified by a verdict approved by the trial judge, must

be sustained if the record contains credible evidence to support the two dominant issues.

The accident occurred at the intersection of Franklin and Second streets in Richmond. These streets cross each other at right angles. Each is 40 feet wide. Franklin street extends east and west, and Second street north and south. A signal light controls the movement of traffic at this intersection.

Plaintiff, a man 67 years of age, testified that at about 10:00 p. m. on November 23, 1940, he was walking west on the north side of Franklin street. As he reached Second street intersection, "The light was setting right for me to cross." At that moment the only vehicles in sight were one, perhaps two automobiles, standing diagonally opposite him on Franklin street on the west side of Second street intersection headed east, and another car moving north on Second street toward Franklin street. As plaintiff reached and passed the middle of the intersection he looked to his right, or north along Second street and saw no vehicle approaching. He heard a noise to his left, glanced around and saw a car, which had made a left turn from Franklin street north on Second street, almost on him. He grabbed at the top of the left front of the car, but was unable to prevent it from knocking him down. As a result of this impact, plaintiff suffered a multiple fracture of his left leg and lacerations and bruises on other parts of his body. The person who was operating the car that struck him backed up, jumped out of the car and tried to help him up. This was H. W. Sanders, the defendant.

J. J. Berry and his son, John A. Berry, two witnesses introduced by plaintiff, stated that they were driving north on Second street. As they reached the Franklin street intersection, the signal light was red. The car stopped and each of them wiped the windshield. Just as the signal lights changed, they saw a car, which they afterwards ascertained to be that of H. W. Sanders, enter the intersection from Franklin street and turn left going north on Second street. As this car reached the lane for pedestrians crossing Second street on the north side of Franklin, it came to a sudden stop. The Berrys

immediately drove across the intersection to the right of defendant's car and parked on the east side of Second street. As their car came to a stop they saw defendant trying to lift plaintiff from the pavement. Both of the Berrys got out of the car and the son helped the defendant put plaintiff on the front seat of defendant's car. The only statement they heard defendant make at this time was: "Help me get him in the car," or "Help me get the old man to the hospital." The only statement made by plaintiff was: "Watch my leg." Immediately thereafter defendant, with plaintiff and a young lady in his car, left the scene.

Plaintiff's testimony contains two other pertinent statements tending to show that defendant was operating the car which struck him. One of them was made on the way to the hospital and in reply to a statement made by defendant to the effect that defendant was doing plaintiff a kindness in carrying him to the hospital. Plaintiff's reply was: "You belong to take me there." The other statement was made after plaintiff was in Memorial Hospital, in which he told the defendant that "he was bound to have been operating the car" which struck him. Defendant made no reply, neither admitting nor denying that he was operating the car at the time plaintiff was struck. The latter statement was made in the presence of a police officer, who corroborated plaintiff's version of the conversation.

Defendant contends: (1) That the foregoing evidence is incredible, and (2) that his testimony, supported by the testimony of his witnesses, is the only true acount of the accident. These contentions will be discussed in the inverse order stated.

Defendant testified that on the night in question his car was parked near the middle of the block west of Second street and opposite 109 E. Franklin street. With his friend, Miss Morrison, on the front seat with him, he started his motor and approached Second street intersection in second gear, traveling 10 to 12 miles per hour. As his car entered the intersection the red signal light flashed, stopping east- and westbound traffic. He made a left turn starting north on

Second street. As the front of his car entered the pedestrian lane, he saw plaintiff lying or sitting just west of the center of the intersection and about the center of the pedestrian lane. He applied his emergency brakes immediately and stopped his car almost instantly. His left front wheel was from one to two feet east of plaintiff. He said: "I didn't hit the man, and no parts of the car came in contact with Mr. Newsome." He immediately got out of the car and went to the plaintiff and shook him, but he "couldn't get anything out of him. He (plaintiff) was very limited in conversation; * * *. I started pulling him up and assisting him up." In so doing, he became overbalanced and fell against the left fender. Plaintiff turned and slipped over on the fender too. About that time Mr. Berry who had stopped his car, came over and assisted the defendant in getting Mr. Newsome into the car.

Defendant further testified that, when he left the scene with the plaintiff on the front seat and Miss Morrison on the back seat of his car, he intended to take plaintiff to the Memorial Hospital, but the plaintiff seriously objected to going to that hospital and requested that he be taken to the "Virginia Hospital." Defendant did not know of a "Virginia Hospital," so he turned and carried the plaintiff to the Retreat for the Sick. On the way the plaintiff was not very lucid in his conversation. He seemed to be more or less dazed. When the parties arrived at the Retreat for the Sick, the superintendent informed defendant that she would not take plaintiff as a patient unless defendant would become responsible for the hospital bill, which defendant declined to do. The party then drove by St. Luke's, St. Elizabeth's and Grace Hospitals. At each hospital he asked plaintiff: "This hospital?" Plaintiff would look around and say: " 'No,' 'uh-uh,' something like that. Couldn't get anything out of him." So he carried him to Memorial Hospital, where plaintiff remarked to him: " 'You were the one that hit me.' That is the first time he accused me of it. Before that he was very appreciative."

Immediately after plaintiff accused defendant of being responsible for his injuries, defendant called the officers and requested them to examine his car. He gave the officers his

version of how plaintiff had received his injuries. The officers examined defendant's car, which was then parked near the Memorial Hospital, and found no dents, scratches, broken places or abrasions on it. They stated that there was a place on the left front fender on which water did not gather as it did on other parts of the car—it was a rainy night—and that this place seemed to have been wiped off. Defendant explained to them that it was drizzling rain at the time he picked plaintiff up, and that, in lifting plaintiff, both of their bodies rubbed against the front fender. At the time, the officers seemed to have accepted defendant's version of the incident.

Mr. Berry and his son testified that on the night of the accident they had taken the license number of defendant's car, and later they went to see the plaintiff in the hospital. The officers who investigated the accident ascertained this fact and interviewed the Berrys. After this interview, the officers saw defendant and told him that two witnesses had seen him strike plaintiff. He immediately demanded to be taken before the Berrys, which was done. Thereupon the officers were informed that the Berrys did not actually see defendant's car hit Newsome, but the Berrys related the facts as they saw them and in accord with their statements as witnesses in the case. No criminal action resulted from the officers' investigation.

Unfortunately, Miss Morrison, when introduced as a witness for defendant, seemed to have been so excited or confused that her testimony has very little probative value. She does state that the sudden stopping of the car threw her forward against the windshield, and that she did not see defendant's car strike plaintiff.

Defendant contends that the evidence in support of the theory of plaintiff is incredible and should be rejected by this court. This contention is based on (1) the physical condition of the plaintiff, (2) his attitude at the time the Berrys arrived at the scene, and (3) his testimony identifying defendant's car.

Plaintiff, on cross-examination, admitted that sometimes he "had spells of unconsciousness," which he said the doctors

called apoplexy. He had been in the hospital on several occasions and within three months prior to the accident. Plaintiff stated that on the night of the accident he did not suffer a spell of unconsciousness. The Berrys stated that he was conscious when they helped him in defendant's car. However, even if plaintiff had had a "spell of unconsciousness" on the street, he would hardly have suffered a multiple fracture of the leg from such a "spell."

The statements of all of the eye-witnesses at the scene were very limited. No one asked the cause of plaintiff's injuries. No one volunteered any explanation. These facts so impressed the Berrys that they took the license number of defendant's car. Later, they searched for plaintiff, located him in Memorial Hospital and there informed him of their knowledge of the accident. A normal person who had received the injuries and shock inflicted on plaintiff would not be in a position to discuss with reasonable intelligence the nature and cause of his injuries immediately after the accident. While the Berrys testified that he was conscious, his reaction certainly would not be that of a normal uninjured person. His failure on this occasion to point to the defendant as the guilty party is entitled to little, if any, consideration.

Defendant's counsel has been very ingenious in his preparation of graphic charts, showing the position of the four cars from the moment the plaintiff entered the intersection until the arrival of defendant upon the scene. In these charts counsel has vividly suggested that one of the cars which plaintiff stated was standing to the west of the Second street intersection might have turned left and struck him before defendant's arrival on the scene. Plaintiff did say that he did not know whether one of the cars he saw standing was the car that hit him. The fair inference from this statement, read in connection with his other testimony, is that he did not know whether defendant's car was one of the two cars he saw on Franklin street headed east. He testified positively that the first man who attempted to help him got out of the car that hit him, and no one but defendant answers this description.

Defendant further contends that according to plaintiff's testimony he was injured before defendant made the turn. This contention is based upon an interval of 30 to 40 seconds. It is argued that, according to plaintiff's testimony, when he entered the intersection the light for east- and westbound traffic changed to green. Therefore, he had ample time to cross the intersection before defendant arrived upon the scene. It is urged that the failure of either of the Berrys to see plaintiff as he was walking across the first half of the intersection is proof of the fact that he had passed before their car arrived at Franklin street. The Berrys stopped for the red light and began to wipe the windshield. Neither of them was paying any attention to pedestrians across the street from them. Their failure to look ahead or to see plaintiff before defendant made the turn is not significant. For this contention to be effective, it is necessary to know the rate of speed plaintiff was traveling. This is not shown by the record. Plaintiff is an old and infirm man. A reasonable inference is that he was walking more slowly than a normal person would. Under the circumstances, a variation of 30 to 40 seconds in crossing the intersection is too slight to show that his account of the accident is contrary to the physical facts or inherently incredible.

We have discussed defendant's contentions in some detail because they were so earnestly stressed by counsel. Each of them is based upon the weight to be given plaintiff's testimony. Considered as a whole, the contentions fail to convince us of the inherent incredibility of plaintiff's evidence.

While defendant, as a witness, and his counsel, as an advocate, laid special emphasis on the fact that the defendant was acting the part of a "good Samaritan" in taking plaintiff to the hospital, a study of all of defendant's testimony shows that he depicted only a minor part of the neighborly acts of kindness which characterized the Biblical character. The true Samaritan not only transported the Israelite from the scene of the injuries and robbery to Jericho, but sat up with him at the Inn, paid his expenses and, on the next day as he

left, said unto the host: "Take care of him; and whatsoever thou spendest more, when I come again I will repay thee."

There are two pertinent admissions in defendant's own testimony which are inconsistent with his innocence: (1) Defendant, on cross-examination, admitted that he neither affirmed nor denied the charge when plaintiff said, in the presence of police officer Bosquet, that he was operating the car which inflicted the injuries; (2) Bosquet testified that defendant said to him: "If he (defendant) hit the old man, he didn't know nothing about it."

■■ Defendant, as a witness, offered an explanation of his silence in the one case and a partial denial of his alleged statement in the other. These explanations were pertinent evidence for the jury. However, the failure of defendant to assert his innocence on these occasions brings the case within the following principle: "A declaration in the presence of a party to a cause becomes evidence, as showing that the party, on hearing such a statement, did not deny its truth; for, if he is silent when he ought to have denied, there is a presumption of his acquiescence. And where a statement is made, either to a man or within his hearing, that he was concerned in the commission of a crime, to which he makes no reply, the natural inference is that the imputation is well founded, or he would have repelled it." *State* v. *Walton*, 172 N. C. 931, 90 S. E. 518. See *State* v. *Jackson*, 150 N. C. 831, 64 S. E. 376; *State* v. *Pitts*, 177 N. C. 543, 98 S. E. 767, where the rule is more fully explained.

It appears to this court that the record contains sufficient credible evidence to take to the jury the question of the identity of the car which struck plaintiff.

Defendant contends that the evidence is insufficient to convict him of negligence. Michie's 1936 Code, sec. 2154 (121), in part, provides: "Drivers of vehicles, * * * when turning to the left, shall pass beyond the center of the intersection, and as closely as practicable to the right of the center of such intersection before turning such vehicle to the left; and, when in any city, * * * shall keep as closely as practicable to the right-hand curb or edge of the street, and shall turn the cor-

ner at a rate of speed not to exceed ten miles per hour. For the purpose of this section the center of the intersection shall mean the meeting point of the medial lines of the highways intersecting one another."

From the evidence the jury had a right to believe that plaintiff, while in the pedestrian lane, had passed west of the center of Second street before he was struck. It is conceded—if not conceded, adequately proven—that when defendant's car stopped he was not "as closely as practicable to the right-hand curb or edge of" Second street. The Berry car passed between defendant's car and the eastern curb of Second street. This evidence convicts defendant of violating the statute, which is negligence. If defendant had made the turn and started north on Second street in accordance with the statute, plaintiff would have been several feet farther west of defendant's car. It follows that the jury had a right to believe that the violation of this statute was the proximate cause of the injuries to plaintiff.

Defendant's fourth assignment of error is stated thus: "The court erred in permitting Lt. Bosquet to state his opinion that plaintiff had been struck by defendant's car, and further erred in refusing to strike out this 'opinion testimony.' "

It appears from the evidence that officer Bosquet was called as a witness for plaintiff. On his direct examination, he confined his statements to relevant testimony. He stated that the police officers had made a report of the accident to the traffic department of the city. Among the numerous questions asked him, on cross-examination, about the contents of the report is the following:

"Q. And as far as you know that report has never been changed?

"A. Never been changed? Well, I changed my report from a hit-and-run to an accident injury."

The attorney for plaintiff, on re-direct examination, attempted to clarify the testimony concerning the report. The court, in an objection raised by defendant, ruled: "You can ask him what his report disclosed, but you cannot ask him to give an opinion." It so happens that, after the police

officers had interviewed the Berrys, they changed their report of the accident from an injury caused by a hit-and-run driver "to an accidental injury by an automobile operated by Mr. Sanders." As an original proposition, the contents of this report would not have been relevant evidence, but under the circumstances the trial court committed no error in permitting the officer to testify to the contents of the report, even though it contained his opinion as to the name of the operator of the automobile which struck plaintiff.

Another assignment of error is based upon the action of the court in granting, over his objection, Instruction No. 2-a. This instruction told the jury that if they believed plaintiff was crossing the intersection on a green light, "then he had a right to expect that defendant would yield the right of way to him, * * *."

The question presented is which, if either, of the parties had the right of way under the circumstances stated. Numerous subsections to Code, sec. 2154, regulate the movement of vehicles and pedestrians at intersections within towns and cities.

Subsection (99) (d) provides: "Signals by lights or semaphores shall be as follows: Red indicates that traffic then moving shall stop and remain stopped as long as the red signal is shown. Green indicates that traffic shall then move in the direction of the signal, and remain in motion as long as the green signal is given."

The regulation in subsection (122) (a), in part, is: "Every driver who intends * * * to turn, or partly turn from a direct line shall first see that such movement can be made in safety, * * *"

Subsection (126) (b) grants the right of way to pedestrians at intersections in these words: "Where no traffic officer is on duty, pedestrians shall have the right of way over vehicles."

The rule stated in subsection (123) (c) is: "The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any

regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices."

When these statutes are read and construed together, as they must be, the reason for excepting the provisions of subsection (123) (c) at intersections where the movement of traffic is controlled by traffic officers or signal direction devices is manifest. To give a pedestrian, crossing an intersection on a red light, the right of way would create much confusion, hinder the orderly movement of traffic and unreasonably impair the safety of travelers upon the highway.

On the other hand, to construe this statute as depriving pedestrians, crossing at intersections with a green light, of the right of way granted by other sections of the Code would turn a traffic safety signal device into an invitation to a place of danger and would make other statutory safety regulations nugatory.

A traffic signal light is not installed for the sole purpose of benefiting vehicular traffic. When the movement of pedestrians is in accord with the regulation of such devices, the right of way expressly given by other statutes is not impaired. But the released signal light, while an invitation to proceed in the same direction in which the driver was heading, is not an invitation to turn into a direction against which the traffic signal is closed, and is therefore not tantamount to a traffic officer's direction to make the turn. In such a case it seems that a pedestrian has the right of way, and not the driver, subject, of course, to the qualifications imposed by the statute upon that right. *Panitz* v. *Webb*, 149 Md. 75, 130 A. 913.

[ ] The instruction is not skilfully drawn and cannot be regarded as a model, but, when read as a whole and with other instructions granted, the giving of it does not constitute reversible error.

The judgment of the trial court is

*Affirmed.*