**Alexandria**

MICHAEL WAYNE STUMPF

v.

COMMONWEALTH OF VIRGINIA

No. 0724-87-4

Decided May 2, 1989

Counsel

Ronald Wayne Fahy, on brief, for appellant.

Richard A. Conway (Mary Sue Terry, on brief), for appellee.

Opinion

**MOON, J.**—Michael Wayne Stumpf appeals from the Circuit Court of Prince William County his conviction for first-degree murder and robbery. Although he had confessed to the murder, Stumpf contends that extrajudicial statements by his wife were admitted in violation of Code § 19.2-271.2. We affirm the conviction because we find the statements were made with Stumpf's knowledge, consent or acquiescence. *See Coppola v. Commonwealth*, 220 Va. 243, 251, 257 S.E.2d 797, 803 (1979), *cert. denied*, 444 U.S. 1103 (1980).

In 1986, Michael and Mary Stumpf had been married for three years and had a five year old son named Patrick. During the course of their unstable marriage, the Stumpfs had "split up off and on." In July 1985, while the Stumpfs lived in Patton, Pennsylvania, Mary Stumpf started dating Earl Merriman, who also lived there. In October, 1985, Mary and Patrick moved in with Merriman, while Michael Stumpf was in prison. When Stumpf was released, he left Pennsylvania and moved to Texas, but he maintained contact with Mary by telephone.

After living with Merriman for several months, Mary moved to Texas, where she again lived with Stumpf. In April, 1986, the Stumpfs moved to Prince William County, Virginia. There they met Roe and Joyce Nidiffer, with whom the Stumpfs lived for several weeks. However, Mary decided to leave Stumpf and return to Pennsylvania. Merriman came to Prince William County in June, 1986, to take Mary back to Pennsylvania. During that trip,

on June 27, Merriman was arrested on Interstate 95 in Prince William County for driving while under the influence of alcohol. Both Stumpf and Mary were present in Merriman's car at the time of his arrest. Merriman's trial for this offense was set for August 19, 1986, in Prince William County General District Court.

Mary lived in Pennsylvania with Merriman until his trial date. On the weekend of August 8, 1986, Stumpf made a trip to Pennsylvania to see Mary and Patrick. While there, Stumpf argued with Merriman several times and a fight between the two men broke out. While Stumpf was in Pennsylvania, Timothy and Mary Jones heard him say that he would "get even" with Merriman, and that Merriman's "day would come." In Prince William, Joyce Nidiffer had heard Stumpf say that "he was going to get rid of Merriman one way or the other." Roe Nidiffer testified that Stumpf had frequently talked about killing Merriman because Merriman had taken his wife away from him.

Because they were with Merriman at the time of his DUI arrest, Stumpf and Mary accompanied him to court in Prince William County. The three of them arrived in Merriman's car at the office of Merriman's Manassas attorney, at about 8 a.m. on August 19, 1986. Prior to leaving Pennsylvania, Merriman had obtained $1400 in cash from his mother to cover any fines, costs, and attorney's fees. Bertha Merriman testified that on the evening of August 18, 1986, she gave her son thirteen one-hundred dollar bills and two fifty dollar bills. At that time she noticed that Merriman was wearing a ring that Mary had given him.

When he arrived at the lawyer's office, Merriman went inside while Stumpf and Mary remained in Merriman's car. When the lawyer learned that the Stumpfs had been present at the time of Merriman's arrest, he asked Merriman to bring them into his office so that he could interview them. Stumpf and Mary refused to enter the office. The lawyer later negotiated a plea bargain under which Merriman pleaded guilty to reckless driving and paid a $100 fine. Merriman also paid the lawyer his fee of $400 by giving him four one-hundred dollar bills. Neither Stumpf nor Mary testified at Merriman's hearing.

After Merriman's appearance in court, he, Mary, and Stumpf bought some beer and took it to a wooded area known as Possum

Point on Quantico Creek. While they were there drinking, Stumpf, according to his confession, approached Merriman from behind and "strangled him with a piece of wire." Mary and Stumpf left the scene in Merriman's car with his money and a ring that Mary had given Merriman. Merriman's body was left at the edge of the water was found floating about five to ten feet offshore on August 21, 1986. Although the actual cause of Merriman's death was "consistent with drowning," a "ligature mark" was present around his neck at the time of autopsy.

At about 4 p.m. on August 19, 1986, Mary and Stumpf appeared at the Nidiffers' home in Prince William. Both appeared to be wet, and Stumpf was permitted to shower there. Mary looked "very drawn" and had mud on her feet and pants. The Stumpfs told the Nidiffers that Merriman was in jail and that they were going back to Pennsylvania in "Mary's" car. Roe Nidiffer noticed that Mary had three or four one-hundred dollar bills. Stumpf told Nidiffer that "they'll carry Merriman in the stretcher the next time."

Later the same day Mary Stumpf checked into the Hunter Motel in Fairfax County close to Interstate 95. Although she obtained a room for two, the desk clerk never saw the other member of her party.

At about 7 p.m. that evening, Mary called Merriman's mother in Pennsylvania and told her that after court her son had walked away to drink beer and told Mary to wait for him in the car. Mary said that she waited for a while, then went looking for him but couldn't find him. When Merriman's mother requested that Mary remain there until she found Merriman, Mary told her that she had no money. Mrs. Merriman sent Mary another $100. At trial Mrs. Merriman testified that "two days and two nights Mary lied to me, she hadn't seen him."

The following day Mary tried to make a missing person's report with the Prince William County Police Department. Because Merriman was an adult and no information was given that would suggest foul play, Mary was told that she had to wait forty-eight hours before the report could be filed. On Thursday, August 21, 1986, Mary filed the report; she and Stumpf then drove Merriman's car back to Pennsylvania.

In Pennsylvania, Mary told her mother, Kathryn Spact, that Merriman was still missing. When Spact told her to take Merriman's car to his mother, Mary gave Spact a one-hundred dollar bill for an old car that Spact had for sale. Spact testified that Stumpf then said, "I hope they find Earl . . . . They'll probably find him in a river."

Timothy Jones, who was a friend to Merriman and the Stumpfs, saw Mary and Stumpf at a bar in Pennsylvania on August 22, 1986. At that time Stumpf cashed a one-hundred dollar bill, and gave Jones a ring that was identified at trial as the ring worn by Earl Merriman on August 18, 1986. Jones' wife (Mary) saw Stumpf with three or four one-hundred dollar bills and accompanied Mary to a nearby market to receive smaller bills for one of them. When Mary Jones asked Stumpf if she could borrow fifty dollars, he told her to ask Mary because he had given her all the money. When asked, Mary refused to part with any of "her money."

Investigator David Watson of the Prince William County Police Department went to Pennsylvania on August 22, 1986. The following day he interviewed Stumpf and Mary Stumpf separately. Although at first Stumpf firmly denied any involvement in Merriman's murder, he finally confessed that he killed Merriman because he had threatened to prevent Stumpf from seeing his son, Patrick, once Mary and Merriman were married.

Mary Stumpf did not testify at her husband's trial. Stumpf neither testified nor offered other evidence at trial.

■ Stumpf contends that the testimony of Bertha Merriman and Roe Nidiffer, as well as his own confession, contained extrajudicial statements made by his wife, Mary Stumpf, in violation of his statutory right to exclude his wife's testimony. Code § 19.2-271.2 provides:

In criminal cases . . . neither [husband or wife] shall be compelled, nor, without the consent of the other, allowed to be called as a witness against the other . . . .

It has also been held that "[a]ny extrajudicial statement made by one spouse as such against the other is likewise inadmissible." *McMillan v. Commonwealth*, 188 Va. 429, 433, 50 S.E.2d 428,

430 (1948).

However, in *Coppola v. Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied*, 444 U.S. 1103 (1980), the Supreme Court recognized and approved certain established exceptions to the rule excluding a spouse's extrajudicial statements:

> Coppola relies upon dicta in *McMillan v. Commonwealth*, 188 Va. 429, 50 S.E.2d 428 (1948), that an extrajudicial statement made by one spouse "as such against the other is . . . inadmissible." *Id.* at 433, 50 S.E.2d at 430. But, in *McMillan*, three other cases were discussed, *Allen v. Commonwealth*, 171 Va. 499, 198 S.E. 894 (1938), *State v. Kosanke*, 23 Wash. 2d 211, 160 P.2d 541 (1945), and *State v. Reid*, 178 N.C. 745, 101 S.E. 104 (1919), to the effect that where declarations of a wife are made at the request of the accused husband, or with his knowledge and consent, they are admissible. In such instances the extrajudicial statements are made by the wife as the husband's *agent* rather than as his spouse. We approve the rule that where the wife's extrajudicial statements are made with the actual or constructive knowledge and with the express or tacit consent of the husband, they are admissible in evidence against him.

220 Va. at 251, 257 S.E.2d at 802-803 (emphasis added).

Admissions of one spouse that are expressly adopted by the other spouse are, therefore, clearly admissible. *See Shiflett v. Commonwealth*, 447 F.2d 50 (4th Cir. 1971), *cert. denied*, 405 U.S. 994 (1972). The language of *Coppola* mirrors the rationale of the co-conspirator exception to the hearsay rule, and nullifies the application of the spousal privilege to extrajudicial statements made by one spouse when acting in concert with the other spouse. The fact that the accused is not charged with conspiring with his spouse is of no consequence:

> [D]eclarations uttered by a co-conspirator in furtherance of a common, illegal design . . . are admissible even though a conspiracy is not charged where the evidence establishes a *prima facie* case of conspiracy.

*Anderson v. Commonwealth*, 215 Va. 21, 24, 205 S.E.2d 393, 395 (1974).

■ There is no question that the evidence in this case established a *prima facie* case of conspiracy between Stumpf and his wife. She played an active role in the concealment of the crime by agreement with her husband and received money from the robbery in violation of Code § 18.2-462. Moreover, a conspiracy is not terminated by commission of the crime until the spoils are divided and the co-conspirators have "gone their separate ways." *Berger v. Commonwealth*, 217 Va. 332, 335, 228 S.E.2d 559, 561 (1976).

Stumpf challenges the admission of testimony given by Bertha Merriman concerning statements made by his wife during telephone conversations that occurred while Mary was at the Hunter Motel, in which Mary fabricated the story that Merriman had disappeared from the courthouse after his trial. The record shows that Mary's statements to Mrs. Merriman were made with the knowledge and consent of Stumpf, who, by reasonable inference, was with his wife when she made them. Stumpf was not only with his wife from the time of Merriman's murder until their arrest in Pennsylvania, he also initially adopted her story of Merriman's disappearance.

Stumpf also challenges the admissibility of Mary's statements to Rod Nidiffer that Merriman was in jail and had given her money for rent. The only reasonable inference that can be drawn from the evidence, since Stumpf was present with Mary at the Nidiffers' home at the time of her challenged statement, is that Mary's statements were made not only with Stumpf's knowledge and consent, but also at his direction. Moreover, Stumpf himself also told the Nidiffers that Merriman was in jail.

Stumpf also challenges the admissibility of references to his wife's admissions, which were contained in the transcript of his confession. The doctrine of adoptive admissions, as recognized and approved in *Coppola* and *Shiflett*, applies to these statements as well. The transcript of Stumpf's voluntary confession reflects that he was the first one to make any reference to Mary's prior statements and that his initial version of events contained many statements that she allegedly had made to him. His references to those statements were obviously necessary to give content to his story, and clearly indicated that he did not consider those communications to be of a private or privileged nature. Therefore, Mary Stumpf's statements were admissible as admissions adopted by

Stumpf.

Stumpf also raises the issue whether the trial court erred by denying him a jury instruction regarding double jeopardy. Multiple convictions in a single trial for murder committed during the commission of robbery and the underlying offense of robbery do not violate the double jeopardy guarantee. *See Spain v. Commonwealth*, 7 Va. App. 385, 373 S.E.2d 728 1988).

For the reasons stated, the conviction is affirmed.

*Affirmed.*

Hodges, J., and Keenan, J., concurred.