COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Humphreys and Clements
Argued at Chesapeake, Virginia


LESTER BERNARD LYNCH, JR.

OPINION BY
v.        Record No. 0107-04-1                    JUDGE ROBERT J. HUMPHREYS
AUGUST 16, 2005

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Charles E. Poston, Judge

L. Steven Emmert (Sykes, Bourdon, Ahern & Levy, P.C., on briefs),
for appellant.

Paul C. Galanides, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Appellant Lester B. Lynch ("Lynch") appeals his convictions, following a jury trial, for

first-degree murder, statutory burglary, robbery, and three counts of using a firearm in the

commission of a felony.  On appeal, Lynch contends that the trial court erroneously admitted an

out-of-court statement under the adoptive admission exception to the hearsay rule.  For the

reasons that follow, we disagree, and affirm his convictions.

I.  BACKGROUND

Under familiar principles of appellate review, we examine the evidence in the light most

favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible

therefrom.  Gonzales v. Commonwealth, 45 Va. App. 375, 378, 611 S.E.2d 616, 617 (2005)

(en banc).  So viewed, the evidence in this case establishes the following.

On June 9, 2001, Belinda Scott was shot and killed inside her home by Lynch, "Tyreke"

Williams, and a third, unidentified man.  After the shooting, Lynch and Tyreke "burst" into a

bedroom occupied by Belinda's son, Ronald, and his friend, Tamika Reid. The third man remained outside the bedroom door. Tyreke told Ronald to "get on his knees," pointed a gun at him, and told Tamika "not to move." Tyreke then repeatedly hit Ronald on the head with the gun and took some money out of Ronald's pockets, while Lynch removed heroin and money from a table in the room. The third man eventually told Tyreke and Lynch, "Let's get out of here." The three men then "ran out of the house."

Earlier that afternoon, Kenneth Parker was "hanging out" at Tyreke's house with Christopher, Tyreke's brother. Kenneth saw Lynch drive up to the house in a black Acura. Tyreke was in the passenger seat. Lynch got out of the car to talk to Christopher, and Tyreke went across the street to get a gun. After he returned, Tyreke agreed to give Kenneth a ride home. Kenneth then got into the Acura with Lynch, Tyreke, and the unidentified third man. However, when Kenneth said that he needed to cross the Campostella Bridge, Lynch told him that they were going on a "sting," and they needed to "take care of [that] first." Thus, Kenneth got out of the car, and Lynch told him that they would return in about thirty minutes.

When the three men returned to Tyreke's house, Kenneth noticed that Tyreke was wearing a different shirt and had small bloodstains on his clothing. Tyreke carried something into his house wrapped up in the shirt he had been wearing before the murder. Kenneth followed. After entering the house, Tyreke went directly to an upstairs bathroom, and Kenneth sat in the upstairs den. Lynch did not enter the house immediately, but remained in the driveway speaking to the third man, who was "looking down at the ground like something was really bothering him."

When Tyreke left the bathroom, he knocked on Christopher's door and told him that "they had just shot a woman." Kenneth joined the conversation and asked Tyreke, "man, what you done got yourself into? You-all done shot a woman?" Tyreke responded, "yeah." Kenneth

asked, "where was you-all at?" Tyreke responded, "we went to Little Ronald's house . . . to go get him." Kenneth then asked, "why would you-all go in and try to do something and rob him or whatever when he cool with everybody?" Tyreke then said that he "don't care who I get" because "[m]y light's due, my rent due, my girl getting ready to leave," and he was "going to get put out."

As Kenneth, Christopher, and Tyreke were discussing whether the "skinny lady" who had been shot was Ronald's mother or sister, Kenneth heard someone climbing the stairs. As Lynch reached the top of the stairs, he asked Tyreke "why he was telling [Kenneth and Christopher] what they had just done." Although Tyreke told Lynch that Kenneth was "cool" and would not tell anyone, Kenneth said he would have "nothing to do with it," and left the house. Kenneth called Ronald's cellular phone and spoke with Tamika, who was still hysterical over the events she had just witnessed.

On September 5, 2001, a grand jury indicted Lynch for "feloniously [] kill[ing] and murder[ing] Belinda Scott," in violation of Code §§ 18.2-32 and 18.2-10, "us[ing], attempt[ing] to use, or display[ing] a firearm while committing . . . [m]urder," in violation of Code § 18.2-53.1, "break[ing] and enter[ing] in the nighttime while armed with a deadly weapon, the dwelling house of Belinda Scott, with intent to commit robbery," in violation of Code § 18.2-90, "us[ing], attempt[ing] to use, or display[ing] a firearm while committing . . . [a]rmed [b]urglary," in violation of Code § 18.2-53.1, "rob[bing] Ronald Scott of U.S. currency, having some value," in violation of Code § 18.2-58, and, "us[ing], attempt[ing] to use, or display[ing] a firearm while committing . . . [r]obbery," in violation of Code § 18.2-53.1.

Before Kenneth testified at trial, the Commonwealth informed the court that it intended to introduce the statement, "Why you telling them what we just did?" under the adoptive admission

exception to the hearsay rule. The parties "argued the matter in chambers," and, based on the Commonwealth's proffer, the court ruled that the statement was admissible.

The jury found Lynch guilty of all six counts as charged in the indictments, and the court sentenced Lynch, in accordance with the jury's recommendation, to thirty years for first-degree murder, twenty years for statutory burglary, five years for robbery, five years for use of a firearm while committing murder, five years for use of a firearm while committing robbery, and three years for use of a firearm while committing burglary. The court set the sentences to run consecutively, resulting in a total active sentence of sixty-eight years in prison. Lynch appeals.

## II. ANALYSIS

On appeal, Lynch contends that the trial court erroneously admitted the statement, "Why you telling them what we just did?" coupled with the substance of the preceding conversation between Kenneth, Tyreke, and Christopher, under the adoptive admission exception to the hearsay rule, reasoning that the evidence was insufficient to demonstrate that Lynch had overheard enough of the conversation to understand what was being discussed. For the reasons that follow, we disagree.

### A.

"'The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion.'" Gonzales, 45 Va. App. at 380, 611 S.E.2d at 618 (quoting Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988)). "However, 'by definition, when the trial court makes an error of law, an abuse of discretion occurs.'" Id. (quoting Bass v. Commonwealth, 31 Va. App. 373, 382, 523 S.E.2d 534, 539 (2000)).

Hearsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule. Clay v. Commonwealth, 33 Va. App. 96, 104, 531 S.E.2d 623, 626-27

- 4 -

(2000) (en banc); see also West v. Commonwealth, 12 Va. App. 906, 909, 407 S.E.2d 22, 23 (1991). And, if the admissibility of a hearsay statement is conditioned upon a finding of certain predicate facts, the party seeking to admit the hearsay evidence must prove, by a preponderance of the evidence, each of those qualifying factors. See Rabeiro v. Commonwealth, 10 Va. App. 61, 64-65, 389 S.E.2d 731, 733 (1990) ("On factual issues relating to the admissibility of evidence, the burden of persuasion is proof by a preponderance of the evidence."); see also Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (noting that the party seeking to have a hearsay declaration admitted "must clearly show" that the evidence falls within an exception to the hearsay rule); Neal v. Commonwealth, 15 Va. App. 416, 420-21, 425 S.E.2d 521, 524 (1992) ("[T]he party seeking to rely upon an exception to the hearsay rule has the burden of establishing admissibility.").[1] These "antecedent facts" must be "determined by the court, and not by the jury." Mullins v. Commonwealth, 113 Va. 787, 791, 75 S.E. 193, 195-96 (1912) (internal quotations omitted); see also Rabeiro, 10 Va. App. at 64, 389 S.E.2d at 732 ("The factual determinations which are necessary predicates to rulings on the admissibility of evidence and the purposes for which it is admitted are for the trial judge and not the jury.").

When deciding whether the proponent of the hearsay statement has sustained his burden of proving the necessary predicate facts, "the trial court, acting as a fact finder, must evaluate the credibility of the witnesses, resolve the conflicts in their testimony and weigh the evidence as a whole." Albert v. Commonwealth, 2 Va. App. 734, 738, 347 S.E.2d 534, 536 (1986). Thus, the

---

[1] Lynch, however, argues that the "clearly show" language from Doe implies that the proponent of a hearsay statement must prove, by clear and convincing evidence, each of the elements needed for application of an exception to the hearsay rule. Neither this Court nor the Virginia Supreme Court has ever applied a clear and convincing standard of proof where the proponent of a statement seeks to admit that evidence under an exception to the hearsay rule. Rather, we interpret the "clearly show" language as merely restating the general proposition that the proponent of a hearsay statement has the burden of proving its admissibility, including proving, by a preponderance of the evidence, each of the facts necessary to support application of the appropriate hearsay exception.

trial court's determination that these factual prerequisites have been met "'is to be given the same weight by the appellate court as is accorded the finding of fact by a jury.'" Id. (quoting Witt v. Commonwealth, 215 Va. 670, 674, 212 S.E.2d 293, 296-97 (1975)); see also Rabeiro, 10 Va. App. at 64, 389 S.E.2d at 733.

Accordingly, when reviewing a trial court's decision to admit a statement under an exception to the hearsay rule, this Court must first decide whether the evidence supports the trial court's conclusion that the proponent of the statement established each of the factual prerequisites for application of the designated hearsay exception. If those factual findings are plainly wrong or without evidence to support them, we will reverse the trial court because it abused its discretion, as a matter of law, in determining that the hearsay exception applied. See Norfolk & Western Ry. Co. v. Puryear, 250 Va. 559, 563, 463 S.E.2d 442, 444 (1995) ("A trial court has no discretion to admit clearly inadmissible evidence because admissibility of evidence depends not upon the discretion of the court but upon sound legal principles." (internal quotations omitted)). If the trial court's factual findings are supported by the evidence, this Court must then determine whether the trial court abused its discretion by admitting the otherwise admissible hearsay statement. See, e.g., Clay, 33 Va. App. at 107, 531 S.E.2d at 628 (after determining that the challenged statement fell within the state of mind exception to the hearsay rule, noting that "[w]e must now determine whether . . . the trial court abused its discretion in judging" that "the prejudicial effect of such evidence outweighed its probative value").

Under the circumstances of this case, we hold that the trial court did not clearly err in holding that the Commonwealth carried its burden of proving the required antecedent facts for application of the adoptive admission exception to the hearsay rule. And, because Lynch has not

advanced any other argument in support of his contention that the trial court erred, we hold that the court did not abuse its discretion by admitting the statement into evidence.

B.

One of the established exceptions to the hearsay rule permits the introduction of an out-of-court statement that qualifies as an "adoptive admission." An adoptive admission may occur either "expressly (*e.g.*, by oral or written statements of the party) or impliedly (*e.g.*, by conduct of the party)." Charles E. Friend, The Law of Evidence in Virginia § 18-49(c) (6th ed. 2003); see also United States v. Robinson, 275 F.3d 371, 383 (4th Cir. 2001) ("A party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence."); 29A Am. Jur. 2d Evid. § 797 (2004) ("[A]doption or acquiescence may be manifested in any appropriate manner," including when the party "expressly agrees to or concurs in an oral statement made by another," "hears the statement and later on essentially repeats it," "utters an acceptance or builds upon the assertions of another," "replies by way of rebuttal to some specific points raised by another, but ignores further points which he or she has heard the other make," or "reads and signs a written statement prepared by another.").

The Commonwealth contends that the adoptive admission in this case is analogous to an adoptive admission by silence. In Virginia, it is well established that "an admission by silence is . . . a form of adoptive admission." Friend, supra, at § 18-49(e).[2] However, the "very distinct

---

[2] As noted by the Virginia Supreme Court,

> when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal proceeding against him, as evidence of his acquiescence in its truth.

James v. Commonwealth, 192 Va. 713, 718, 66 S.E.2d 513, 516 (1951); see also Tillman v. Commonwealth, 185 Va. 46, 56, 37 S.E.2d 768, 773 (1946) ("It is well settled that statements

requirements"[3] needed to establish admissibility of an adoptive admission by silence are not directly applicable in the context of other forms of adoptive admissions. See id. That is, the specific antecedent factors that must be proven to admit an adoptive admission by silence stem from the "uncertainty which attends interpreting a person's silence as an implied admission of the statement made." 29A Am. Jur. 2d Evid. § 799 (2004). When an individual is not silent but, instead, affirmatively responds to a statement, those same concerns are not implicated.

Thus, if the individual alleged to have adopted a statement manifests his assent to a statement by some form of conduct other than silence, the inquiry changes slightly. Under those circumstances, the trial court need only determine whether, in light of the resulting verbal or non-verbal response, "'there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.'" Robinson, 275 F.3d at 383 (quoting United States v. Jinadu, 98 F.3d 239, 244 (6th Cir. 1996)).

---

made in the presence and hearing of another, to which he does not reply, are admissible against him as tacit admissions of their truth or accuracy, when such statements are made under circumstances naturally calling for reply if their truth is not intended to be admitted."). "This principle rests upon that universal rule of human conduct which prompts one to repel an unfounded imputation or claim." Tillman, 185 Va. at 56, 37 S.E.2d at 773; see also Sanders v. Newsome, 179 Va. 582, 592, 19 S.E.2d 883, 887 (1942).

[3] If a party seeks to prove an adoptive admission by silence, the proponent of the statement must establish the following factual conditions: (1) the statement must have been heard by the party alleged to have acquiesced in the statement, (2) the party must have understood that "he was being accused of complicity in a crime," (3) "the circumstances under which the statement was made must have been such as would afford him an opportunity to deny or object," and (4) "the statement must have been such, and made under such circumstances, as would naturally call for a reply." Owens v. Commonwealth, 186 Va. 689, 699, 43 S.E.2d 895, 899 (1947) (internal quotations omitted); accord Dowden v. Commonwealth, 260 Va. 459, 469, 536 S.E.2d 437, 442 (2000); Baughan v. Commonwealth, 206 Va. 28, 32, 141 S.E.2d 750, 752 (1965); Strohecker v. Commonwealth, 23 Va. App. 242, 252, 475 S.E.2d 844, 849 (1996). Overall, the "essential inquiry in each case is whether," under the totality of the circumstances, "a reasonable person would have denied" the statement. Knick v. Commonwealth, 15 Va. App. 103, 107, 421 S.E.2d 479, 481 (1992); see also Wienbender v. Commonwealth, 12 Va. App. 323, 325, 398 S.E.2d 106, 107 (1990).

- 8 -

C.

On appeal, Lynch argues that the statement, "Why you telling them what we just did?," coupled with the other parties' statements discussing the murder, does not fall within the adoptive admission exception to the hearsay rule because there is no evidence that Lynch overheard the entire conversation between Kenneth, Christopher, and Tyreke. At the outset, however, we must clarify that this case does not involve an adoptive admission by silence. The evidence does not show that, while Kenneth, Christopher, and Tyreke were discussing the murder, Lynch approached the conversation and remained silent. Rather, he joined the conversation and affirmatively stated, "Why you telling them what we just did?" Thus, this is not a case where the individual alleged to have adopted a statement "failed to reply" to a direct or indirect accusation of wrongdoing.[4] Rather than requesting introduction of a statement and Lynch's resulting *silence*, the Commonwealth sought to introduce a statement and Lynch's resulting *verbal response*. As a result, the four factors set forth in Owens are not directly applicable under the circumstances of this case.

We must determine, rather, whether the Commonwealth presented sufficient foundational evidence from which the trial court could infer that Lynch heard, understood, and agreed with the substance of the conversation between Kenneth, Christopher, and Tyreke. Under the circumstances of this case, we hold that the trial court could reasonably have inferred that Lynch heard enough of the conversation to know that the other men were discussing the murder, understood that he had been implicated in that murder, and, by his verbal statement, manifested his agreement with the fact that he had been involved in the murder.

---

[4] "For the adoptive admission exception to apply, a direct accusation is not needed." Strohecker, 23 Va. App. at 254, 475 S.E.2d at 850.

First, the Commonwealth presented sufficient evidence from which it could be inferred that Lynch overheard at least a portion of the conversation between Kenneth, Christopher, and Tyreke. Although Lynch was outside when the conversation began, Kenneth testified that, while they were discussing the "skinny woman," he heard Lynch coming up the stairs. Lynch then entered the conversation and asked, "Why you telling them what we just did?" This conversation occurred in Tyreke's home, immediately after he and Lynch returned from the crime scene. Considering the context, time, and location of the discussion, the trial court could reasonably have inferred that Lynch heard enough of the conversation to understand that the other men were talking about the murder in which he had just participated. See Wienbender v. Commonwealth, 12 Va. App. 323, 326, 398 S.E.2d 106, 108 (1990) (affirming admission of hearsay statement where "the trial judge could have inferred that the defendant heard the statement"); Stumpf v. Commonwealth, 8 Va. App. 200, 206, 379 S.E.2d 480, 484 (1989) ("The record shows that [the declarant's] statements . . . were made with the knowledge and consent of [the defendant], who, *by reasonable inference*, was with [the declarant] when she made them."); see also United States v. Tedder, 801 F.2d 1437, 1451 (4th Cir. 1986) (where jury heard "conflicting testimony about the conditions under which [an accomplice] made his incriminating statements," including testimony that the defendant "was within earshot" but about "ten feet away," "the jury was entitled to conclude that [the defendant] heard and adopted [the accomplice's] account"); State v. Thompson, 420 S.E.2d 395, 402 (N.C. 1992) (rejecting argument that the "person making the statement [must] be in the physical presence of the defendant, concluding instead that "the proper focus is on the defendant's ability to hear and understand the statement being made").

Second, the trial court could reasonably have inferred that Lynch understood not only the nature of the conversation, but also the fact that he had been implicated in the shooting.

Specifically, Lynch entered the conversation and immediately asked, "Why you telling them what *we* just did?" Considering Lynch's use of the word "we," the trial court could reasonably have concluded that Lynch understood not only that the murder was being discussed, but that he, too, had been fingered as a participant in the crime.

Third, the trial court could reasonably have inferred that Lynch's statement, "Why you telling them what we just did?," was sufficient to indicate his agreement that he had been involved in the murder. Again, Lynch's use of the word "we" is telling. Rather than stating, "Why you telling them what *you* just did," Lynch asked, "Why you telling them what *we* just did?" Ordinarily, an individual accused of murder would take reasonable steps to deny his participation in that murder. Here, however, Lynch did not merely fail to deny his participation in the shooting—he, by his own words, affirmatively implicated himself. Thus, the trial court could reasonably have concluded that Lynch's statement was sufficient to indicate his agreement that he had been involved in the murder. See, e.g., Robinson, 275 F.2d at 383 (affirming trial court's admission of a conversation between the defendants where the parties discussed a murder they had just committed, noting that, "had either [party] disagreed with a statement by the other, he would have made his disagreement known"); see also United States v. Handy, 668 F.2d 407, 408 (8th Cir. 1982) (holding that defendant's interjection, "Yes, we did," during co-conspirator's discussion of an attempted murder was an adoptive admission); cf. Clemmer v. Commonwealth, 208 Va. 661, 665, 159 S.E.2d 664, 667 (1968) (holding that, where an officer asked the defendant "about his drinking," and the defendant responded that it "wasn't any of [the officer's] business what he had been drinking," this statement was "not such that one can infer from it a tacit admission by defendant that he had been drinking, or was under the influence of alcohol," reasoning that the defendant's "answer that it was none of the trooper's business what he had been drinking can be interpreted as an insolent answer to an officer of the law, but it cannot be

construed as a tacit admission that defendant had been drinking alcohol or was under the influence of alcohol").

Finally, we note that any residual doubt as to whether Lynch agreed that he had participated in the murder went to the weight of the evidence, not its admissibility.  See Thompson, 420 S.E.2d at 403 ("A response which is not the equivalent of a denial may indicate acquiescence and be considered by the jury for what it is worth."); see also United States v. Tocco, 135 F.3d 116, 128-29 (2d Cir. 1998) (holding that defendant's nod when witness told him that defendant's accomplice was talking about their involvement in an arson constituted an adoptive admission, reasoning that the statement was "exactly the type of statement that an innocent person, under these circumstances, would normally deny," but that the meaning of the nod was "ultimately a question for the jury to assess").

## III.  CONCLUSION

For these reasons, we hold that the trial court did not err in admitting Lynch's statement and the substance of the preceding conversation under the adoptive admission exception to the hearsay rule.  Accordingly, we affirm his convictions.

Affirmed.

Benton, J., dissenting.

"As a general rule, hearsay evidence is incompetent and inadmissible." Neal v. Commonwealth, 15 Va. App. 416, 420, 425 S.E.2d 521, 524 (1992). Furthermore, a codefendant's out-of-court statement implicating a defendant in a crime is a category of hearsay that is presumptively and inherently unreliable. Lilly v. Virginia, 527 U.S. 116, 131 (1999). In view of these principles, "[a] party who relies upon an exception to an exclusionary rule of evidence bears the burden of establishing admissibility." Doe v. Thomas, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984).

At a pretrial hearing, the trial judge considered Kenneth Parker's testimony as proffered. Parker testified that Gregory Williams, Lester B. Lynch, and a "younger fellow" arrived at Williams's brother's residence in the evening. Williams exited the car and rang the doorbell. After Williams's brother came downstairs and opened the door, Williams and his brother went upstairs followed by Parker. Lynch was outside the building talking to the "younger fellow."

Based on Parker's proffered testimony, the trial judge ruled that statements Williams made to his brother and Parker inside the residence the day the killing occurred were admissible. In pertinent part, Parker's testimony established the following:

> A. When I followed [Williams] upstairs, I went to the den. He went to his brother's room.
>
> Q. So you weren't in the hallway then; is that correct?
>
> A. Not at that time. I didn't go into the hallway until [Williams's] brother . . . came out of the room. And when he came out of the room, I went to the bathroom. When I went to the bathroom, I overheard [Williams] telling [his brother] what had happened.
>
> Q. So this conversation took place in the bedroom?
>
> A. No, it took place in the hallway. His brother came into the hallway because his girlfriend was in the room. She was going into labor.

Q.  At this time [Williams] tells his brother what has happened; is that correct?

A.  The little young boy downstairs is trigger happy.

Q.  My question is he told his brother what had happened?

A.  Yeah.

Q.  At that point you don't see Mr. Lynch, do you?

A.  No, not at that time.  He didn't come up the stairs right then. He didn't come up the stairs until . . . .

He didn't come up the stairs -- like when I got in the conversation like after I overheard [Williams], what he was telling his brother, that's when I got in the conversation, and that's when [Lynch] came up the stairs.

Q.  In fact, you've testified before you don't know what he heard, do you?

A.  What who heard?

Q.  [Lynch].

A.  I can't hear for him.  You know what I am saying?  Only thing I can do is tell you what [Lynch] said.  As far as what he heard, them his ears.  I can't tell you exactly what he heard.  Only thing I know is [Lynch] asked [Williams] why was he telling [Williams's brother] what they had just done.

*     *     *     *     *     *     *

A.  Yeah.  I mean, I didn't put the exact point of time, whether he came when [Williams] was talking or whether he came when I was talking.  I didn't say that in my testimony at [Williams's] trial.  I'm telling you [Lynch] came upstairs when we was talking and he asked [Williams] why was he telling us that.  At what point what he heard or whether I was talking or whether [Williams] was talking, I don't know.  You know what I am saying?  You're asking me to tell you something that I don't know.

Q.  Did he ever say what that was?

A.  What what was?

Q. You said, why are you telling him what we just done? Did he ever say what that was that they had just done?

A. No, but [Williams] responded back to him and said, this my brother, and [Parker] is cool. He ain't going to say nothing. Eventually he was talking about what he was telling us about.

Q. So you assume that, right?

A. Yeah. Well, I am assuming.

The trial judge ruled "that the matter will be an adoptive admission." Over Lynch's

hearsay objection, Parker later testified at trial as follows:

Q. What starts to happen when you get upstairs?

A. When I got in the den area, [Williams] had went to the bathroom. He came out and knocked on his brother's door, and he starts talking to his brother. He was telling him about what they had just done. So I was in the den area. I could hear basically what they were saying.

Q. Did you have any problem hearing anything that was being said?

A. No. And I heard [Williams] say that they had just shot a woman. So when I heard the part that they had just shot a woman, that's what really, really, you know, gripped my attention.

So I came out of the den, and I was like, man, what you done got yourself into? You-all done shot a woman? And [Williams] was like, yeah. So I was like, where was you-all at? He was like, we went to [Ronald Scott's] house. . . .

He said we went to go get [Scott]. And I was like, why would you-all go in and try to do something and rob him or whatever when he cool with everybody? You know, he hang out with us. And [Williams] was like, man, I'm going to get put out. My light's due, my rent due, my girl getting ready to leave and I don't care who I get.

So I said, well, who was the lady that you-all shot? So he was like, it was a skinny lady. I said, that man's mom is, you know, skinny. And he was like, no, it won't his mom. It probably was his sister. I said, what difference does it make if it was his sister or his mom, you know? And at that time [Lynch] was coming up the stairs.

- 15 -

On cross-examination, Parker repeats that Lynch is outside of the residence when Parker, Williams, and Williams's brother entered it.

Q. And you get upstairs --

A. Right.

Q. -- and there is a conversation that goes on. [Williams] goes into the bathroom. You go into the den. Then [Williams] and his brother engage in a conversation.

A. Correct.

Q. At that time [Williams] tells him that they've just killed a woman?

A. Yeah. He said -- these words is his exact words. He said, "That young kid downstairs leaning on the car is trigger happy." And [Williams's] brother was like, what you talking about?" And [Williams] like, "Man, he just shot a lady."

Q. And at that point, the person that you're describing as Lester Lynch is not in the house, is he?

A. No. He didn't come up until --

        *     *     *     *     *     *     *

Q. And then at some point while you're talking to [Williams], the person comes upstairs and says, "Why are you telling him what we just done?"

A. Not the person. Him. The gentleman right there, Mr. Lester Lynch. He came up the stairs and asked him, he said, "Why are you telling them what we just done?"

Q. Did he ever say why you telling them why we went to kill someone?

A. No. He didn't say nothing about that. He asked him --

Q. Did he ever --

A. [Williams] had already told us that someone had got killed. And [Lynch] walked up and asked him why was he telling us what they had just done.

- 16 -

Q. But you said [Williams] told his brother we had been on a sting, right? Isn't that what you said?

A. Yes.

Q. And you said --

A. And [Williams] told them what happened.

Q. Didn't you just say a sting could be anything?

A. Like a sting is slang for robbing or you can go steal something to get away with it. I got away with that sting. You could rob somebody. You could plan to rob somebody and say I'm going on a sting tonight, you know. You don't know. It could be stealing radios out cars, anything. A sting is going to do something wrong, period.

Q. So he never said it was killing anyone?

A. [Williams] said they had shot someone. He said they just shot --

Q. But that's what you're saying that [Williams] said?

A. Yeah. [Williams] said they had just killed somebody.

The Commonwealth, which was the party "'seeking to have hearsay declarations of a witness admitted as an exception to the general rule[,] must clearly show that [the hearsay declarations] are within the exception.'" Id. (citation omitted). I would hold that the Commonwealth failed to meet its burden and that the trial judge erroneously admitted Parker's recitation of Williams's statements as "an adoptive admission" by Lynch. When a statement is offered as an adoptive admission, a primary inquiry the trial judge must make is "whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." United States v. Jinadu, 98 F.3d 239, 244 (6th Cir. 1996). To satisfy this exception to the hearsay rule, the evidence must prove the "statement tending to incriminate one accused of committing a crime is made in his presence and hearing." James v. Commonwealth, 192 Va. 713, 718, 66 S.E.2d 513, 516 (1951).

Simply put, the Commonwealth's evidence did not prove the predicate facts necessary to invoke the hearsay exception. See Sapp v. Commonwealth, 263 Va. 415, 424, 559 S.E.2d 645, 650 (2002) (holding that the proponent of evidence, which is claimed to fall within an exception to the hearsay rule, has the burden "to lay a proper predicate for its introduction"); United States v. Robinson, 275 F.3d 371, 383 (4th Cir. 2001) (noting that under the federal rules a primary determination is "whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement"). Both case law and commonsense dictate that for a defendant to have adopted an admission as his own "foundational facts" must first establish that the defendant heard and understood the statement.

No evidence proved Williams made his statement in Lynch's "presence and hearing." James, 192 Va. at 718, 66 S.E.2d at 516. Indeed, the evidence established just the opposite: that Lynch was not in the presence of the three men when Williams spoke about the killing. Parker testified he was in the bathroom when Williams first mentioned the killing to his brother. By Parker's own testimony, he joined the conversation only after he emerged from the bathroom in the den, and he was aware Lynch had not then entered the residence: "[h]e [Lynch] didn't come up the stairs." Obviously, Lynch could not have adopted the statement as his own if he never heard it. It is simply speculation to say at what point, if at all, Lynch adopted any of Williams's comments. Yet, the jury was allowed to attribute to Lynch all of Williams's statements. In view of the evidence, it is just as likely that Lynch was motivated to speak merely because he detected a heated argument as he ascended the stairs. For these reasons, I would hold that the evidence failed to prove that Lynch heard Williams's conversation and that, therefore, the trial judge erred in admitting into evidence Williams's statements about the killing.

I would further hold that the admission of the hearsay evidence was not harmless. This inadmissible evidence was so prejudicial to Lynch that we cannot reasonably conclude that it did not affect the verdict.

> "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 732 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). Applying this test, the United States Supreme Court has held that "the principle of Kotteakos [means] that when an error's natural effect is to prejudice substantial rights and the court is in grave doubt about the harmlessness of that error, the error must be treated as if it had a 'substantial and injurious effect' on the verdict." O'Neal v. McAninch, 513 U.S. 432, 444 (1995). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Kotteakos, 328 U.S. at 765. Consistent with these principles, the Supreme Court of Virginia has held that even if "the other evidence amply supports the . . . verdicts, [error is not harmless when] the disputed [evidence] may well have affected the . . . decision." Cartera v. Commonwealth, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978). In short, our "harmless error analysis . . . [is not] simply a sufficiency of the evidence analysis." Hooker v. Commonwealth, 14 Va. App. 454, 458, 418 S.E.2d 343, 345 (1992).

The inadmissible evidence had such a substantial influence that we cannot reasonably conclude that it did not affect the verdict. The jury was asked to make a critical credibility determination whether to believe Lynch's alibi witnesses, who placed him somewhere else during the killing, or to believe Scott, Reid, and Parker, whose testimony placed Lynch at the

- 19 -

house where the woman was killed. The inadmissible hearsay evidence served to impermissibly buttress the credibility of the Commonwealth's witnesses because the evidence identifying Lynch as being present at the killings was problematic and was marred by a number of inconsistencies.

For example, Reid, who was present in the house when the killing occurred, testified that the man who entered the room with Williams wore a mask. After the killing, she could not identify Lynch from photographs. She only later identified him when she saw him in court as the defendant. Scott, on the other hand, was in the same room as Reid but testified that the man did not wear a mask. He did not initially identify the man as Lynch but did so at trial.

Significantly, the record indicates that shortly after the killing, Scott identified Parker, not Lynch as one of the persons who entered the residence when his mother was killed. He admitted at trial that he first told police that Williams, Williams's brother, and Parker may have been the ones who robbed him. This identification was significant because Scott and Parker knew each other quite well. Scott also knew Williams. The jury may not have believed this curious change in Scott's memory and identification had they not learned about Lynch's "adopted" confession that Parker related at trial.

Scott also testified that Parker twice had visited him at his mother's house earlier that day. The first time, Parker purchased heroin. He later returned to the house and demanded a return of his money, accusing Scott of selling bad heroin. Scott testified that during both occasions Williams, whom he knew, and Lynch, whom he had not previously met, were in a car waiting for Parker. Conversely, in his testimony, Parker never acknowledged his earlier presence at Scott's mother's house or that he knew Scott had a large amount of money and heroin in the house.

Significantly too, Parker's testimony conflicted with Scott's testimony about Lynch's whereabouts during the day.  Whereas Scott testified that Lynch was waiting for Parker in the car when Parker purchased heroin, Parker testified that he first saw Lynch with Williams in the early evening and that he accompanied them in the car for just one block because Lynch and Williams had someplace else to go.  Parker testified that he next saw Williams and Lynch when they returned to Williams's brother's residence with a "younger fellow" whom he did not identify.  At that time, Williams went upstairs and made his statement about the shooting.

The Commonwealth's use of Parker's testimony to tie Lynch to Williams's statement effectively shifted the focus from Scott's earlier statement to the police that Parker, whom he knew, was indeed the unmasked man in the house during the shooting.  When Scott's trial testimony identified Lynch, Parker buttressed Scott's identification by relating Lynch's "adopted" confession.  With this change, the jury likely saw Parker as an observer, not a participant.  It is, therefore, reasonable to assume that in weighing the evidence the jury gave substantial weight to Parker's testimony relating the confession of Williams and implicating Lynch as being present at the killing.  A confession of a perpetrator implicating the presence of a codefendant at the scene of a crime is inherently prejudicial.

> Clearly, where the principal direct evidence against the accused is the testimony of an accomplice, the credibility of that witness will be a significant factor in the jury's determination of the accused's level of culpability.  [The Supreme Court has] consistently held that this credibility determination rests with the jury and is not subject to challenge on appeal merely because the testimony is self-serving, results from a favorable plea arrangement, or because the witness is himself a felon.  However, here the issue is not the credibility of the witness, but rather the potential for harm caused by the erroneous admission of evidence which tends to support the jury's credibility determination.  In that context we must presume that such evidence had the potential to influence the jury into accepting the properly admitted evidence as

> more credible and, thus, to taint the jury's determination of the facts.

Lilly v. Commonwealth, 258 Va. 548, 553, 523 S.E.2d 208, 210 (1999).

I would hold that it does not plainly appear that the error did not substantially and injuriously affect the verdict. The evidence, if successful in achieving its purpose, clearly would have affected the verdict. See Norfolk Ry. & Light Co. v. Corletto, 100 Va. 355, 360, 41 S.E. 740, 742 (1902) (holding that "[i]t is . . . well settled that if a . . . mistake of the court appear[s] in the record it must be presumed that it affected the verdict of the jury, and is therefore ground for which the judgment must be reversed, unless it plainly appears from the whole record that the error did not affect, and could not have affected, their verdict").

For these reasons, I would reverse the convictions and remand for a new trial.